Filed 1/19/18 (reposted to provide corrected version)

**CERTIFIED FOR PUBLICATION**


# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO


| | | |
|---|---|---|
| THE PEOPLE, | | |
| Plaintiff and Respondent, | | E066284 |
| v. | | (Super.Ct.No. FVI1302698) |
| ERIC DAVID ROBBINS, | | OPINION |
| Defendant and Appellant. | | |

APPEAL from the Superior Court of San Bernardino County. Colin J. Bilash, Judge. Affirmed in part; reversed in part with directions.

Waldemar D. Halka, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina, Meagan J. Beale and Annie Featherman Fraser, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant and appellant Eric David Robbins guilty of first degree murder (Pen. Code, § 187, subd. (a))[1], and attempted murder (§§ 187, subd. (a), 664)). The jury found true the allegations that (1) the murder was committed by means of lying in wait (§ 190.2, subd. (a)(15)); (2) the attempted murder was committed willfully and with premeditation and deliberation (§ 189); and (3) during the murder and attempted murder, defendant personally and intentionally discharged a firearm proximately causing death to another person (§ 12022.53, subd. (d)).  The trial court sentenced defendant to prison for a term of life without the possibility of parole, plus a consecutive term of 25 years to life.

Defendant raises nine issues on appeal.  First, defendant contends the attempted murder conviction is not supported by substantial evidence.  Second, defendant contends the transferred intent theory argued by the prosecution is inapplicable to the lying-in-wait special circumstance.

Third, defendant contends the trial court erred by refusing to instruct on heat of passion voluntary manslaughter.  Fourth, defendant contends the trial court erred by refusing to instruct on heat of passion attempted voluntary manslaughter.  Fifth, defendant asserts his trial counsel rendered ineffective assistance by failing to request the jury be instructed on how provocation affects the degree of murder.  Sixth, defendant asserts the prosecutor erred by failing to ensure his witnesses complied with the in limine ruling prohibiting references to defendant's alleged support of racist

---

[1] All subsequent statutory references will be to the Penal Code unless otherwise indicated.

organizations.  Seventh, defendant contends the cumulative prejudicial effect of the alleged errors in contentions three through six requires the judgment be reversed. Eighth, defendant contends his sentence for attempted murder should be life, rather than seven years to life. Ninth, defendant contends the trial court must exercise its discretion as to whether to strike the firearm enhancements.  (§ 12022.53, subd. (h).)  We reverse part of defendant's sentence with directions and otherwise affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

The afternoon of August 11, 2013, defendant and his wife, Dawn,[2] were aggravated with one another.  Throughout the day, Dawn called her mother, Carmen Griego, saying she wanted defendant to leave the home but defendant refused to leave. Defendant began drinking beer and smoking marijuana around 3:00 p.m., consuming approximately 33 beers.  Defendant became intoxicated.  At approximately 8:30 p.m., after Dawn again called Carmen, Dawn's parents went to defendant's and Dawn's home.  When Dawn's parents arrived, defendant and Dawn were arguing.

Dawn's father, Ernest Griego, offered to get a motel room for defendant. Defendant responded, "[T]his is F-ing America.  I have rights and I don't have to leave."  Defendant walked up to Ernest.  Defendant made a fist and stared at Ernest. Carmen told defendant she would call the police if defendant touched Ernest. Defendant backed away.  Ernest and Carmen left.

---

[2] We use first names for ease of reference and clarity as some of the witnesses share a last name.  No disrespect is intended.

Defendant left the house because he believed Carmen had called the police. Defendant left in his truck. Whenever Dawn made defendant leave the house, he took his guns and golf clubs with him because those items were the most important to him. On this occasion, defendant put an AR-15 rifle and .308 bolt action rifle in his truck. Defendant intended to purchase beer at an AM/PM convenience store and sleep in the desert.

Clarence Jones worked as a security guard at the AM/PM in Victorville. During cashier shift changes, it was Jones's responsibility to ensure that nobody attempted to purchase anything at the AM/PM because the cashiers had to count the money in their drawers. Thus, Jones stood outside the door of the AM/PM telling people they would have to wait 10 minutes to make a purchase. Most of the time people complied with Jones's directive to wait. The customers who were already inside the store at the time of the shift change were told the store would be closing briefly and to make their transactions quickly or leave. The cashiers began counting their cash once the store was empty.

Daniel Olivera worked as a cashier at the AM/PM in Victorville. On August 11, 2013, Olivera worked from 2:00 p.m. to 10:00 p.m. During the 10:00 p.m. cashier shift change, Jones stood outside the AM/PM door telling people they would need to wait 10 minutes to make a purchase.

Defendant approached Jones. Jones told defendant a shift change was taking place and defendant could not enter the store. Defendant said, "I gotta take a piss and pay for some gas." Jones replied, "Sir, we'll be opened in a couple minutes. You're

4

welcome to wait." Defendant became angry because he could see customers in the store lined up at the register. Defendant made racist remarks, such as "nigger," "boy," and used profanity. Jones is black.

Jones said, "[S]ir, I'm only a security guard. I don't have much power here." Defendant reached for the door, in order to open it. Jones put his hand on the door to hold it closed. Defendant said, "[O]h so it's like that? [E]njoy your power while you have it." Jones told defendant he could go inside the store, but he could not purchase anything. Defendant replied, "I'll be back, I'll be back."

Defendant reentered his truck. Jones took photographs of defendant leaving, including defendant's truck. Defendant saw Jones photographing him. Jones took photographs because defendant scared Jones. Jones did not capture a photograph of defendant's license plate.

Defendant drove to a field and urinated. While in the field, defendant looked at the AM/PM and thought, "What a nice shot." Defendant was approximately 170 yards from the AM/PM. Defendant set up his .308 rifle on a bipod. The rifle had a scope on it.

Defendant laid prone on the ground, looking through his scope. Defendant "sat there for a long time" waiting. Defendant had a difficult time identifying the different people at the AM/PM so he "crab walk[ed]" forward. Olivera exited the store, and smoked a cigarette with Jones. Jones stepped away to share his cigarette lighter with a customer. Defendant mistook Olivera for Jones. At approximately 10:40 p.m., defendant fired the gun, killing Olivera.

5

The next day, defendant watched the news and realized he killed Olivera, rather than Jones. Defendant threw away the shoes he wore during the killing and removed the stickers from the back of his truck. Approximately 10 days later, defendant drove past the AM/PM looking for Jones. Defendant wanted to "finish the job" by killing Jones with the .308 rifle. Defendant did not see Jones at the AM/PM.

During a police interview, defendant explained that he wanted to kill Jones because "[i]t's a respect thing." Defendant explained that he was angry because Jones refused to let defendant enter the store. Defendant denied that he wanted to kill Jones due to racial animus. Defendant denied that he was a white supremacist.

## DISCUSSION

A.    SUBSTANTIAL EVIDENCE

Defendant contends his conviction for the attempted murder of Jones is not supported by substantial evidence.

Under the substantial evidence standard "we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. . . . We resolve neither credibility issues nor evidentiary conflicts." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

" '[A]ttempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' [Citation.] Hence, in order for [a] defendant to be convicted of the attempted murder of [Jones], the

prosecution had to prove he acted with specific intent to kill [Jones]." (*People v. Smith* (2005) 37 Cal.4th 733, 739.)

Defendant confessed during a police interview that he wanted to kill Jones. Therefore, there is evidence of an intent to kill. Defendant shot a gun at the person he believed was Jones. Therefore, there is evidence of a direct but ineffectual act toward accomplishing the intended killing. Accordingly, there is substantial evidence of attempted murder.

Defendant contends the evidence of attempted murder is insufficient because defendant fired a single bullet, which struck the person at whom his gun was aimed. Defendant reasons that he aimed at a single person and shot a single bullet at that person, so there is only one victim—Olivera. In other words, defendant intended to kill the person at whom the gun was aimed, and that person was killed, so only that person is the victim.

If defendant had been convicted of murdering Jones, there would be an issue; however, defendant was convicted of attempting to murder Jones. Defendant did attempt to murder Jones, as set forth *ante*. The single bullet intended for Jones was mistakenly shot at Olivera, thus creating an ineffectual act toward killing Jones.

The record reflects defendant made a mistake of fact. "When a person commits an act based on a mistake of fact, his guilt or innocence is determined as if the facts were as he perceived them." (*People v. Beardslee* (1991) 53 Cal.3d 68, 87-88.) If X shoots Y, with the intent to kill Y, but Y is already deceased at the time of the shooting, X is guilty of attempted murder. (*People v. Islom* (2015) 240 Cal.App.4th 1146, 1150.)

7

In this case, defendant shot Olivera, with the belief he was shooting Jones and with the intent to kill Jones, therefore defendant is guilty of attempted murder because defendant's guilt is "determined as if the facts were as he perceived them." (*Beardslee*, at pp. 87-88.) Defendant intended to shoot Jones, mistakenly believed he was shooting Jones, and fired his gun killing Olivera. Because defendant believed he was killing Jones, defendant is guilty of the attempted murder of Jones.

We find *People v. Bland* (2002) 28 Cal.4th 313, 325 (*Bland*) to be helpful in explaining how defendant's single act and single bullet could produce two victims: "The conceptual problem . . . arose even where the deadly force missed the intended victim completely but the State nonetheless sought to charge the assailant with the inchoate crime of intent to murder or assault with intent to murder. If the mens rea were in limited supply, to which of two crimes should it be allocated? How could a single mens rea be made to do double duty?

"The [C]ourt [of Special Appeals of Maryland] then supplied the answer. As we did in [*People v. Scott* (1996) 14 Cal.4th 544] it rejected the notion that transferring the intent [for Olivera's murder] uses it up. 'By thinking of the mens rea in such finite terms—as some discrete unit that must be either here or there—we have created a linguistic problem for ourselves where no real-life problem existed. Criminal acts, consummated or inchoate, are discrete events that can be both pinpointed and counted. A mens rea, by contrast, is an elastic thing of unlimited supply. It neither follows nor fails to follow the bullet. It does not go anywhere. It remains in the brain of the criminal actor and never moves. It may combine with a single actus reus to make a

8

single crime. It may as readily combine with a hundred acti rei, intended and unintended, to make a hundred crimes, consummated and inchoate. Unforeseen circumstances may multiply the criminal acts for which the criminal agent is responsible. A single state of mind, however, will control the fact of guilt and the level of guilt of them all.' " (*Bland*, *supra*, 28 Cal.4th at p. 325, italics omitted.)

Defendant intended to kill Jones. Defendant mistakenly aimed his gun at Olivera and killed Olivera. Defendant's mens rea created two crimes with a single bullet. Defendant murdered Olivera with malice aforethought and attempted to murder Jones because he had the specific intent to murder Jones and mistakenly believed he was killing Jones. As our Supreme Court has held, "[R]eliance on a transferred intent theory of liability for the first degree murder of the unintended victim did not prevent the prosecutor from also charging defendants with attempted murder of the intended victim." (*People v. Scott*, *supra,* 14 Cal.4th at p. 551.)

An alternative way of explaining the issue is as follows: Defendant wanted to kill Jones. If defendant fired at Jones and shot a wall, defendant would still be guilty of the attempted murder of Jones. If defendant fired two bullets killing X and Y, believing they were Jones, defendant would be guilty of two murders and the attempted murder of Jones. The point is that defendant wanted to kill Jones and mistakenly believed he was killing Jones. Thus, the crime of attempted murder occurred. (See *People v. Stone* (2009) 46 Cal.4th 131, 141 [" 'A defendant who intends to kill one person will be liable for multiple counts of murder where multiple victims die, but only one count of attempted murder where no one dies' "].)

9

B.    <u>LYING IN WAIT</u>

Defendant contends the transferred intent theory argued by the prosecution is inapplicable to the lying-in-wait special circumstance.

We apply the de novo standard of review to this question of law. (*People v. Garcia* (2016) 62 Cal.4th 1116, 1122.) A defendant is eligible for imprisonment for life without the possibility of parole if he "intentionally killed the victim by means of lying in wait." (§ 190.2, subd. (a)(15).) Defendant's contention is based upon the wording "intentionally killed the victim": Can transferred intent apply if the statute requires intent to kill the victim?

" 'Under the classic formulation of California's common law doctrine of transferred intent, a defendant who shoots with the intent to kill a certain person and hits a bystander instead is subject to the same criminal liability that would have been imposed had " 'the fatal blow reached the person for whom [it was] intended." ' " (*Bland*, *supra*, 28 Cal.4th at pp. 320-321.)

At the outset, we note that in the case of *People v. Hajek and Vo* (2014) 58 Cal.4th 1144 our Supreme Court commented that it found "no support in case law" for the trial court making a transferred intent analogy on an issue of lying in wait. (*Id*. at p. 1184, fn. 12, abrogated on another point in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.) We understand the Supreme Court's observation as meaning it is an issue of first impression as to whether transferred intent applies to the lying-in-wait special circumstance.

10

"The lying-in-wait special circumstance requires proof of ' " 'an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage.' " ' " (*People v. Bonilla* (2007) 41 Cal.4th 313, 330.) The "intentional murder" is the substantive crime, in that murder requires malice aforethought (§ 187, subd. (a); *People v. Saille* (1991) 54 Cal.3d 1103, 1114-1115), so it is the three factors set forth *ante* that comprise the lying-in-wait special circumstance.

Our Supreme Court has explained that the lying-in-wait special circumstance qualifies as a capital crime because it requires "[a] substantial period of watching and waiting," which "helps distinguish lying-in-wait murder from ordinary murder." (*People v. Sandoval* (2015) 62 Cal.4th 394, 416 (*Sandoval*).) The three factors *ante* generate the evidence of watching and waiting that elevate lying-in-wait murder above ordinary murder. Thus, it is those three factors that are critical to the lying-in-wait special circumstance.

Our Supreme Court has explained, in a lying-in-wait special circumstance case, " 'Lying in wait is the functional equivalent of proof of premeditation, deliberation, and intent to kill.' " (*Sandoval*, *supra*, 62 Cal.4th at pp. 415-416.) Our Supreme Court further explained that the " ' "period [of lying in wait] need not continue for any particular length ' "of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation." ' " ' " (*Id.* at p. 416.) Thus, to the extent one finds an intent requirement in the lying-in-wait special circumstance, it would be

11

the same deliberate intent that is associated with premeditation and deliberation. (*People v. Saille*, *supra*, 54 Cal.3d at p. 1115 [deliberate intent raises second degree murder to first degree].)

Our Supreme Court has held that the deliberate intent associated with premeditation and deliberation can transfer. The high court wrote, "[I]f a person purposely and of his deliberate and premeditated malice attempts to kill one person but by mistake and inadvertence kills another instead, the law transfers the intent and the homicide so committed is murder of the first degree." (*People v. Sears* (1970) 2 Cal.3d 180, 189.) Because lying in wait provides proof of the same type of deliberate intent associated with premeditation and deliberation, the intent associated with lying in wait transfers in the same manner as the intent associated with premeditation and deliberation.

In sum, the lying-in-wait special circumstance creates a capital offense because it requires proof of "[a] substantial period of watching and waiting" (*Sandoval*, *supra*, 62 Cal.4th at p. 416), which is proved by the three factors set forth *ante*. The requirement that the defendant "intentionally killed the victim," is equivalent to premeditation and deliberation, i.e., the first degree murder mental state. (*Id*. at pp. 455-457.) Transferred intent applies to premeditation and deliberation, and therefore, it also applies to killings that qualify for the lying-in-wait special circumstance. Accordingly, we conclude there was no error.

C.     HEAT OF PASSION MANSLAUGHTER

1.     *ADDITIONAL FACTS*

In this subsection, we present the facts in the light most favorable to a heat of passion finding.  When defendant approached Jones, Jones said a shift change was taking place and defendant could not enter the store for 10 minutes.  Defendant said something to the effect of, "I gotta take a piss and pay for some gas."  Jones replied, "That shit can wait!"  Defendant made racist remarks, such as "nigger," "boy," and used profanity.  Jones felt threatened.

Jones said, "[S]ir, I'm only a security guard.  I don't have much power here." Defendant reached for the door, in order to open it.  Jones put his hand on the door to stop defendant.  Jones, while moving to grab the door, may have "swatted defendant's hand away."  Jones again told defendant he could not enter the store.  Defendant said, "[O]h so it's like that?  [E]njoy your power while you have it."  Jones told defendant he could go inside the store, but he could not purchase anything.  Defendant replied, "I'll be back, I'll be back."  During a police interview, defendant said, "I lost it, and I shot the wrong motherfucker."  Defendant felt "push[ed] around" by Jones.

2.     *ANALYSIS*

Defendant contends the trial court erred by refusing to instruct on heat of passion voluntary manslaughter.

" ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence.  [Citations.]  The general principles of law governing the case are those

13

principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." ' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154.)  We apply the de novo standard of review.  (*People v. Cole* (2004) 33 Cal.4th 1158, 1218.)

Heat of passion is not an element of voluntary manslaughter.  Rather, it is a theory of partial exculpation that reduces murder to manslaughter by negating the element of malice.  (*People v. Moye* (2009) 47 Cal.4th 537, 549.)  "A heat of passion theory of manslaughter has both an objective and a subjective component.  [¶]  ' "To satisfy the objective or 'reasonable person' element of this form of voluntary manslaughter, the accused's heat of passion must be due to 'sufficient provocation.' ' ' " (*Ibid.*)  Provocation is sufficient when it would " ' " ' cause an " 'ordinary [and sober person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than judgment.' " ' " ' " (*People v. Rivera* (2011) 201 Cal.App.4th 353, 366; see also *People v. Rangel* (2016) 62 Cal.4th 1192, 1226.)  The provocation that incites the defendant must have been caused by the victim—" ' "[T]he victim must taunt the defendant or otherwise initiate the provocation." ' " (*People v. Souza* (2012) 54 Cal.4th 90, 116; *People v. Carasi* (2008) 44 Cal.4th 1263, 1306.)

Jones told defendant that defendant would have to wait 10 minutes to make a purchase, and Jones initially told defendant he could not enter the store.  Jones also placed his hand on the door to physically prevent defendant from entering the store and possibly swatted at defendant's hand.

14

A surveillance video from August 11, 2013 showed people walking away after Jones told them the store was closed. The assistant manager of the AM/PM said people were walking away because they were leaving. The assistant manager explained, "Some of them that you see get out of the vehicle and then come halfway up and leave is because [Jones] is telling them it's going to be about 10 minutes so they're either going to go back to the car and wait or go to another gas station."

Jones stated that "[m]ost of the time people comply" with his directions to wait for the store to reopen. During defendant's police interview, defendant said, "My attitude. My fucking anger. He fucking wouldn't let me in. Big deal. I shoud'a just went somewhere else."

The evidence reflects that Jones's statements informing defendant that defendant would have to wait 10 minutes, and Jones's acts of holding the door closed and swatting at defendant's hand would not cause an ordinary person of average disposition to act rashly or without due deliberation and reflection, and from his passion rather than judgment. The ordinary person's response to Jones's statement and actions would be to (1) walk away and wait, or (2) walk away and drive to another gas station. Because the evidence does not reflect that an ordinary person would act rashly in response to Jones's statement and actions, the trial court did not err by refusing to instruct on heat of passion voluntary manslaughter.

D.    HEAT OF PASSION ATTEMPTED VOLUNTARY MANSLAUGHTER

Defendant contends the trial court erred by refusing to instruct on heat of passion attempted voluntary manslaughter.  As explained *ante*, heat of passion, in particular the element of sufficient provocation, was not closely and openly connected with the facts before the court.  Accordingly, we conclude the trial court did not err by refusing to instruct on heat of passion.

E.    INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant asserts his trial counsel rendered ineffective assistance by failing to request the jury be instructed on how provocation affects the degree of murder.  Defendant asserts that after the trial court refused to instruct on heat of passion, his trial counsel should have requested an instruction on how provocation can reduce a first degree murder to second degree murder.

To demonstrate ineffective assistance of counsel, defendant must show " 'counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and there is a reasonable probability that, but for counsel's unprofessional errors and/or omissions, the trial would have resulted in a more favorable outcome.' . . .  ' " '[If] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation,' the claim on appeal must be rejected." ' " (*People v. Carrasco* (2014) 59 Cal.4th 924, 982.)

16

" '[T]he existence of provocation which is not "adequate" to reduce the class of the offense [from murder to manslaughter] may nevertheless raise a reasonable doubt that the defendant formed the intent to kill upon, and carried it out after, deliberation and premeditation.' " (*People v. Wickersham* (1982) 32 Cal.3d 307, 329, disapproved of on another point by *People v. Barton* (1995) 12 Ca.4th 186, 201.)

"The test of whether provocation or heat of passion can negate malice so as to mitigate murder to voluntary manslaughter is objective." (*People v. Padilla* (2002) 103 Cal.App.4th 675, 678.) "The test of whether provocation or heat of passion can negate deliberation and premeditation so as to reduce first degree murder to second degree murder, on the other hand, is subjective." (*Ibid.*)

Defendant said during a police interview that he had consumed 33 beers and marijuana on the night of the killing. Defendant said he was intoxicated. During the first police interview, approximately 12 days after the killing, the detective began the interview by saying, "I smell a little alcohol, but I think you're OK." Later that day, during a second interview, the detective said to defendant, "The alcohol you can smell it. 'Cause you were sleeping in here for a while, so, like, when I opened up the door I was like, 'whoa, alcohol.' "

Evidence of voluntary intoxication can be used to negate evidence of premeditation and deliberation. (§ 29.4, subd. (b).) Thus, evidence of intoxication can operate to reduce a first degree murder to second degree murder. (*People v. Turk* (2008) 164 Cal.App.4th 1361, 1376-1377.) The trial court instructed the jury on how voluntary intoxication reduces first degree murder to second degree murder. During

closing argument, defendant's trial counsel argued that defendant consumed "about 30 beers" and marijuana within approximately six hours.  Defense counsel asserted defendant did not plan the shooting because he was intoxicated.

Defendant's trial counsel, in evaluating the case, could reasonably conclude that the proof of intoxication was stronger than the proof of provocation.  Defense counsel might believe the evidence of intoxication was stronger because few people would doubt that 30 beers in six hours plus marijuana would cause a person to be inebriated; however, many people might doubt that Jones's statements and actions amounted to provocation.  (See *People v. Souza*, *supra*, 54 Cal.4th at p. 116 [victim must cause provocation]; *People v. Carasi*, *supra*, 44 Cal.4th at p. 1306 [same].)

Thus, in assessing the case, defense counsel could reasonably choose to argue only intoxication to the jury because it was a stronger and clearer theory and would lead to the same second degree murder conviction as would a provocation theory.  Defense counsel may not have wanted to muddy his theories by presenting two alternative routes to second degree murder, and therefore chose to present only the stronger intoxication theory.  Accordingly, we conclude defendant has not established that his counsel's performance fell below an objective standard of reasonableness under prevailing professional norms.

F.     PROSECUTORIAL ERROR

1.     *PROCEDURAL HISTORY*

Prior to trial, the trial court granted defendant's motion to exclude references to defendant's possible white supremacist associations and/or beliefs. The trial court reasoned that the case did not involve a hate crime so such evidence would be more prejudicial than probative. (Evid. Code, § 352.)

During trial, the prosecutor asked Carmen, "Anything unusual about the white pickup truck?" The prosecutor was referring to the truck defendant was driving during the killing. Carmen responded, "He had stickers in the back of the window. It was just like a regular 4x4 TRD, white in color, he had stickers on the back window, like maybe an Obama sticker or swastika and there was another one but I don't remember what that is." The prosecutor asked Carmen, "Well, do you have a photographic memory of what the stickers are on the truck?" Carmen replied, "Well, there was a swastika sticker, if that's what you're—I'm not."

When Ernest testified, the following exchange occurred:

"[Prosecutor]: Are you familiar with the defendant's vehicle?

"[Ernest]: A white Toyota truck.

"[Prosecutor]: Anything unusual about that vehicle?

"[Ernest]: No, just the regular truck with stickers on the back windows.

"[Prosecutor]: What kind of stickers?

"[Ernest]: Not a skeleton but, like a German helmet on a decal on there, might have been a clothing line, I'm not sure."

19

While the jury was at its lunch recess, the trial court remarked that Carmen testified about a swastika sticker on defendant's truck and Ernest testified about a sticker for a clothing line on defendant's truck; defense counsel clarified Ernest mentioned a German helmet. Defense counsel said he did not believe the prosecutor had a malicious intent, and the point of the prosecutor's question was to prove stickers had been on the truck and that defendant removed them. The prosecutor said, "Right and [defense] Counsel's aware of this and so the Court knows, nowhere does it make a reference to a Swastika sticker, so that was out of the blue, news to both of us." The court said it would admonish the jury to not consider the swastika evidence for any purpose.

At the end of the day, the trial court said to the jury, "There was testimony from one of the witnesses about perhaps the vehicle identified as belonging to the defendant that had a Swastika or German helmet, clothing design, whatever, you're not to interpret anything about that design one way or the other. The sole purpose is identification, stickers and for the purpose of testimony. What you use it for is up to you, but as far as what it is, not relevant, even if you believe it was a Swastika or a helmet, [it] has nothing to do with the case and just keep that in mind because that came out. There's no bearing on the case at all."

2.     *ANALYSIS*

Defendant asserts the prosecutor erred by failing to ensure his witnesses complied with the in limine ruling prohibiting references to defendant's alleged support for racist organizations. The People assert defendant forfeited this issue by failing to

20

object in the trial court, or to the extent defendant's trial counsel requested an admonishment, the trial court complied with the request. (See *People v. Tully* (2012) 54 Cal.4th 952, 1037-1038 (*Tully*) [failure to object on grounds of prosecutorial misconduct forfeits the issue].) We choose to address the merits of defendant's contention.

" ' "It is, of course, misconduct for a prosecutor to 'intentionally elicit inadmissible testimony.' [Citations.]" [Citation.] Such misconduct is exacerbated if the prosecutor continues to elicit such evidence after defense counsel has objected.' [Citation.] However, a prosecutor cannot be faulted for a witness's nonresponsive answer that the prosecutor neither solicited nor could have anticipated." (*Tully*, *supra*, 54 Cal.4th at p. 1035.)

The prosecutor said he had no knowledge of a swastika sticker being on defendant's truck prior to Carmen's testimony. As a result, the prosecutor could not have anticipated Carmen's testimony regarding the swastika sticker. Because the prosecutor could not have anticipated the testimony, there was no misconduct. (See *Tully*, *supra*, 54 Cal.4th at p. 1038 [prosecutor could not have anticipated the testimony so there was no misconduct].)

When the prosecutor asked Carmen a yes or no question about having a photographic memory, Carmen gave a nonresponsive answer that again mentioned the swastika sticker. Because Carmen's answer was nonresponsive, the prosecutor could not predict that Carmen would again discuss the swastika sticker. Because the prosecutor could not have anticipated Carmen's answer, we conclude there was no

21

misconduct. (See *Tully*, *supra*, 54 Cal.4th at p. 1038 [prosecutor could not have anticipated the testimony so there was no misconduct].)

When the prosecutor asked Ernest about the stickers on the truck, Ernest mentioned a German helmet sticker that might be associated with a clothing company logo. It does not appear from this record that the prosecutor was attempting to elicit inadmissible evidence from Ernest. For example, the prosecutor did not follow-up with Ernest to ask what other stickers may have appeared on the truck. Ernest's failure to mention any stickers other than the possible clothing company sticker indicates that the prosecutor may have instructed Ernest not to mention any racist stickers. In sum, on this record, it has not been demonstrated that the prosecutor intentionally elicited inadmissible testimony. Therefore, we conclude prosecutorial misconduct has not been established.

### G.    CUMULATIVE ERROR

Defendant contends the cumulative prejudicial effect of the alleged errors in "Arguments I to IV" (subsections C-F) require the judgment be reversed. We have found no errors. Therefore, we have nothing to cumulate. (See *People v. Duff* (2014) 58 Cal.4th 527, 562 ["nothing to cumulate"].)

### H.    SENTENCE

#### 1.    *PROCEDURAL HISTORY*

In count 1, for the offense of first degree murder (§ 187, subd. (a)), with the special circumstance of lying in wait (§ 190.2, subd. (a)(15)), the trial court imposed a sentence of life without the possibility of parole (LWOP). In regard to the firearm

enhancement (§ 12022.53, subd. (d)) associated with the murder conviction, the trial court said, "[T]hat's a mandatory term of 25 years to life." The LWOP and 25-years-to-life sentences were to be served consecutively.

In count 2, for the offense of attempted murder (§§ 187, subd. (a), 664)), which was committed willfully and with premeditation and deliberation (§ 189), the trial court imposed a "statutory sentence [of] seven years to life." As to the firearm enhancement (§ 12022.53, subd. (d)) associated with the attempted murder conviction, the trial court said "25 years to life by statute." The 25-years-to-life firearm enhancement sentence was consecutive to the "seven years to life" sentence; however, all of the count 2 sentence was to be served concurrent to the count 1 sentence. Thus the trial court pronounced defendant's total sentence as "25 years to life, plus life without the possibility of parole."

### 2.     *ATTEMPTED MURDER SENTENCE*

Defendant contends his sentence for attempted murder should be life, rather than seven years to life. The People concede defendant is correct.

The trial court sentenced defendant to prison for a concurrent term of seven years to life for the attempted murder conviction. The sentence for an attempted murder that is deliberate and premeditated is imprisonment for life with the possibility of parole. (§ 664, subd. (a).) Accordingly, we will reverse defendant's attempted murder sentence and direct the trial court to impose a concurrent term of life with the possibility of parole.

23

### 3. *FIREARM ENHANCEMENT*

Defendant requests this court remand the case to the trial court so the trial court can exercise its discretion regarding whether to strike one or both of the firearm enhancements (§ 12022.53, subd. (d)). (§ 12022.53, subd. (h).) The People concede the case should be remanded.

The trial court sentenced defendant on June 10, 2016.

On January 1, 2018, section 12022.53, subdivision (h), became effective. (Sen. Bill. No. 620 (2017-2018 Reg. Sess.) § 2.) That subdivision provides, "The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing strike or dismiss an enhancement otherwise required to be imposed by this section. The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law." (§ 12022.53, subd. (h).) Prior to the effective date of section 12022.53, subdivision (h), the imposition of a 25-years-to-life sentence was mandatory for a violation of section 12022.53, subdivision (d). (Sen. Bill. No. 620 (2017-2018 Reg. Sess.).)

Unless there is evidence to the contrary, courts presume that the Legislature intends for a statutory amendment reducing criminal punishment to apply retroactively in cases that are not yet final on appeal. (*In re Estrada* (1965) 63 Cal.2d 740, 747-748; *People v. Brown* (2012) 54 Cal.4th 314, 324.) This presumption is applied not only to amendments reducing a criminal penalty, but also to amendments giving the trial court discretion to impose a lesser penalty. (*People v. Francis* (1969) 71 Cal.2d 66, 76.)

Section 12022.53, subdivision (h), vests the trial court with the discretion, at sentencing, to strike or dismiss a firearm enhancement, which would result in a defendant having a lesser sentence. There is nothing in the language of section 12022.53, subdivision (h), or in the broader language of the Senate Bill, indicating the Legislature intended the subdivision to be only prospective. (Sen. Bill. No. 620 (2017-2018 Reg. Sess.).) Accordingly, we conclude section 12022.53, subdivision (h), may be applied in the instant case because (1) it vests the trial court with authority to lower defendant's sentence, and (2) defendant's sentence was not final at the time the subdivision became effective. (*People v. Francis*, *supra*, 71 Cal.2d at pp. 75-76.) We will reverse the sentences for defendant's firearm enhancements so that the trial court may exercise its discretion under section 12022.53, subdivision (h).

## DISPOSITION

Defendant's sentence for the attempted murder conviction (§§ 187, subd. (a), 664); count 2) is reversed. The trial court is directed to impose a concurrent term of life with the possibility of parole (§ 664, subd. (a)) for the attempted murder conviction in count 2. The sentences for the firearm enhancements in counts 1 and 2 (§ 12022.53, subd. (d)) are reversed. The trial court is directed to exercise its discretion under section 12022.53, subdivision (h).[3] If the trial court elects not to strike or dismiss one or both enhancements, then the trial court is directed to resentence defendant for the firearm enhancement(s) (§ 12022.53, subd. (d)). The trial court is directed to issue an amended

---

[3] Nothing in this opinion is intended to indicate in what manner the trial court should exercise its discretion.

abstract of judgment and forward it to the appropriate agency/agencies.  In all other respects, the judgment is affirmed.

CERTIFIED FOR PUBLICATION

MILLER
J.

We concur:

McKINSTER
Acting P. J.

CODRINGTON
J.