Filed 2/23/21  P. v. Frazier CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>    v.<br><br>LUTHER FRAZIER,<br><br>      Defendant and Appellant. | C082028<br><br>(Super. Ct. No. 15F01458) |

Defendant Luther Frazier was found guilty by jury of first degree murder (Pen. Code, § 187)[1] and additionally found to have personally and intentionally discharged a firearm in the commission of the offense.  (§ 12022.53, subd. (d))  He was sentenced to 50 years to life.

---

[1] Undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

1

Defendant contends the trial court abused its discretion by denying his posttrial *Marsden*[2] motion alleging ineffective assistance of counsel, and by refusing to appoint new counsel to investigate a motion for new trial.[3] In supplemental briefing, defendant contends he is entitled to a remand for resentencing so that the trial court can exercise its discretion as to whether to strike the firearm enhancement. We shall remand the matter for that purpose and otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant fatally shot the victim outside the victim's apartment. At trial, defendant testified and claimed self-defense.

The victim was defendant's heroin supplier. A video surveillance camera recorded defendant's car approaching the victim's apartment prior to the shooting. A postal carrier saw defendant and another person arguing during what appeared to be a drug deal. Defendant was holding a short barrel .38-caliber revolver. The person with whom defendant was arguing walked away and defendant followed. The two men went between some buildings. The postal carrier heard gunshots, and while running away from the scene, he looked back and saw defendant walk out.

An autopsy showed that the victim was shot six times -- in the chest, abdomen, and pelvis, including at least once in the back. All shots were fired from close range.

Defendant later told a friend he had "murked somebody." The friend told the police that "murked" meant "killed."

Defendant resided at his parents' home. His father owned .38-caliber revolver, which he discovered was missing after hearing about a shooting in the neighborhood. The police arrested defendant at the parents' home, but did not find the gun.

---

[2] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

[3] Defendant made two posttrial *Marsden* motions, as we explain below. He claims error only as to the second motion.

In a videotaped interview with the police played for the jury, defendant claimed acquaintances must have stolen his father's gun. He admitted the victim was his heroin supplier. Throughout the earlier parts of the interview, defendant denied being at the scene that day, but then admitted going to the victim to beat him up because the victim had threatened his family. Defendant said another individual, who had accompanied defendant, shot the victim.

During his trial testimony, defendant disavowed his police interview statement[4] admitting he "lied through [his] teeth," but saying he did so to protect his family, who the victim had threatened. Defendant testified the victim had engaged in a campaign of extortion and intimidation to gain use of defendant's car and made a series of threats to defendant's family. Defendant claimed the victim professed to be a G-Mobb gang member and warned defendant that if he went to the police, the gang would kill his parents. Defendant told the jury he shot the victim in self-defense after the victim pulled out his gun.

**The First *Marsden* Motion**

After the parties rested and the jury left the courtroom, defense counsel stated that defendant wanted to address the court and suggested that it occur outside the prosecutor's presence. The prosecutor left.

Defendant told the trial court that he felt defense counsel had been ineffective because he had promised to produce evidence corroborating defendant's story, consisting of information gleaned by a private investigator from the internet about the victim's involvement with guns and gangs, but had not done so. Asked by the court if there was anything more, defendant said, "That's it, Your Honor."

---

[4] The videotape is not in the appellate record. A transcript of the interview was provided to the jury and to this court, but was not admitted in evidence. Since neither party questions the accuracy of the transcript, we rely on it.

In response, counsel said the best his investigator had found was "a quasi sort of girlfriend of [the victim] who said that he was involved in drugs." Counsel considered this "irrelevant" in light of the anticipated and actual testimony about drug sales in and out of the victim's apartment.

Counsel added that defendant had not claimed self-defense until after "it became abundantly clear that this [third] person he was blaming was tracked down by the Citrus Heights Police Department and had a rock solid alibi." Then, for the first time, defendant talked about "his family and [the victim]'s threats, et cetera." Although potential witnesses, including the victim's roommates, had corroborated defendant's claim that the victim treated him badly, there was no evidence tying the victim to guns or gangs. This incident did not occur in the territory of G-Mobb, the victim's alleged gang. He did not fit the profile of a gang member, and there was no evidence of gang paraphernalia or tattoos.

Counsel told defendant that his self-defense story was his third version of events, there was no evidence supporting it, and the jury would not believe it if he testified to it.

Defendant asserted that there were unproduced witnesses. Counsel replied that a search for Fowler and Marlow, the victim's two roommates, had been unsuccessful. One had an outstanding no-bail arrest warrant, while the other was apparently living in Las Vegas and could not be found.

The trial court denied the *Marsden* motion, finding that counsel's account was credible, defendant had not shown that there was any material evidence counsel failed to present, counsel had used his best judgment to make strategic decisions, and there was no irretrievable breakdown in the relationship between counsel and defendant.

**The Second *Marsden* Motion**

After the jury returned its verdict, defendant filed two letters requesting a new trial on the grounds that counsel was ineffective and biased against him.

4

In the first letter, defendant complained that counsel failed to provide "witnesses [he] asked for, police records, gang profiles, proper description of the two different weapons." Counsel showed bias against defendant "by calling me a junky on numerous occasions." Counsel "rarely spoke during the proceedings" and "didn't provide evidence that was available." Counsel had told defendant's father there was a plea offer, but did not tell defendant. Counsel told defendant if he spoke the truth, the jury would find imperfect self-defense at worst.

In the second letter, defendant added that counsel failed to get defendant's "psych records from the jail or the street," did not tell the court that defendant was "off my psych meds," failed to provide defendant the autopsy report, told him throughout the case that he was going to lose, yet simultaneously told him the jury would find imperfect self-defense if he told the truth, and failed to present corroborating evidence about the victim's involvement with guns and gangs. Defendant requested new counsel on retrial.

On the scheduled date of sentencing, the trial court asked whether there had been a plea offer. The prosecutor and defense counsel said there was not.

Permitted to speak on his own behalf, defendant reiterated the allegations in his letters. After he said he was asking for new counsel, the court conducted a *Marsden* hearing.

Defendant asserted that the victim's roommates could have been brought in to testify; the one who lived in Las Vegas had been in town during trial and could have been subpoenaed, and trial could have been continued until these witnesses were available. Counsel had been provided photos showing the victim and his roommate, Fowler with guns, as well as statements from the roommates saying the victim always had a gun, but did not introduce them in evidence. Counsel failed to put the victim's "gang profile" or his police record before the jury. Counsel failed to "give proper rebuttal or cross-examination to recall witnesses that I felt that was pertinent," in particular the postal carrier, and "[d]idn't go into detail about difference in guns." Counsel texted and

5

received e-mails during trial, "unprofessional" conduct that showed he was not paying attention. Defendant did not get the chance to explain that he "went into protective custody" in the jail because people from the victim's gang kept trying to fight him there. Counsel did not provide the jury with a psychological evaluation of defendant done at the jail.

Counsel responded that the roommate in Las Vegas had been located and detained, but was released despite the outstanding warrant against him, and then could not be found again. Counsel had already obtained a couple of continuances, the prosecutor had long been ready for trial, and it was unclear how much longer the trial could have been continued to locate witnesses. In any event, the roommates' testimony would not have benefited defendant: they claimed the victim had seen a suspicious person "sneaking around the neighborhood," went out to confront him, and got shot by him. In other words, their stories were inconsistent with defendant's self-defense claim.

Counsel said the alleged "photo of the gun" depicted a rifle, which would not have helped defendant because there was no evidence a rifle was involved in the case. The alleged witness statements that the victim always had a gun apparently referred to a "group gun" possessed by one of his roommates; there were no guns in the apartment.

Counsel asserted that evidence of defendant's psychological evaluation or medications would not have benefited him, given his changing stories about the case and his ultimate decision to claim self-defense. Furthermore, the videotaped police interview showed nothing to suggest defendant was "off his psych meds" at the time.

Counsel explained that the postal carrier had been inconsistent about whether the gun he saw had a long or a short barrel, but had consistently said he saw only one gun and defendant was holding it. This evidence did not support defendant's claim that the victim was also armed.

Counsel said that he had explained to defendant that the jury would not believe his self-defense claim, but would see him as a "junkie," "somebody who was strung out" and

6

"killed your drug dealer because you were pissed at him basically." That was what defendant was referring to when he complained that counsel had called him a junkie.

Counsel indicated that he could not properly have questioned defendant on the stand about "protective custody." In any event, defendant's claim was based only on his allegations that unnamed people had threatened him and on a long e-mail from a friend of the victim that expressed the wish defendant would get what was coming to him.

Counsel admitted that he checked his e-mails during the trial, but only on breaks.

Given the opportunity to respond, defendant said he had "evidence right here through statements from transcripts saying from . . . Fowler, that they're always in a gang. . . [¶] Also saying right here in this transcript that he's the type of person to have a gun, the type of person to have had a gun. [¶] Also in transcripts from . . . Morrow from discovery saying right here he had a lot of problems with gangs, and his . . . web KP file had notations he needed to be separated in jail from Bloods. [¶] Also in statements right here from . . . Morrow, also stating that I always backed down. I never tried to confront him. Always tried to avoid conflict."[5]

Defendant also said: "I have it right here, discovery telling there's a significant difference between the guns that the mailman was talking about and my father's gun. . . . [¶] Also, it even goes into description in the discovery stating what [the victim] was wearing, a black sweatshirt, and a description of the gun that [the postal carrier] was talking about. He didn't go into detail about that for my defense. [¶] And also in the transcript for [the postal carrier] he's even describing everything, the difference between me and [the victim]. So I felt that that needed to be brought up. I have evidence right here, Your Honor, in these transcripts."

---

[5] Nothing in the record shows what "transcripts" and "statements" defendant was referring to.

The trial court responded that its notes on the postal carrier's cross-examination showed counsel asked him specifically about "the barrel and what he saw about the gun." Furthermore, the postal carrier had made clear that he saw only one gun, which was short-barreled, silver chrome, and shiny, not black.

Asked if he wished to add anything else, defendant said: "Yeah. I think that was very pertinent for the trial, Your Honor, because my father's gun is a long barrel. If he would have [seen] my gun, then he would have definitely spoken up and said he saw a longer barrel gun that was more looking like black instead of chrome silver. I felt that was a very big deal." Defendant explained that this was pertinent to his self-defense claim because "that was his gun that the mailman saw."

The trial court said, "But I believe he also, correct me if I'm wrong, made it clear that the person with the gun was an African American male."

Defendant replied: "In his statement, Your Honor, he used the description it was two African American males. One was 5'6", 200 something pounds, Your Honor. And also he went into description saying it was a black sweatshirt and the police also saying that [the victim] was wearing a black sweatshirt, also, Your Honor."

After stating, "just so the record is clear," that the victim was a white male, the trial court denied defendant's *Marsden* motion. The court noted that some of defendant's points (the gang issues and the photographs) were addressed at the prior *Marsden* hearing. The court then stated: "Let's say [the victim] was part of a gang. Let's say he was seen other times with a gun. You're saying he had a gun. The jury could have believed that. The thing is[,] would it make a difference when the evidence showed the victim was shot multiple times in the back, witnesses saw one gun, you had no injuries, there were no other ballistics found to corroborate the victim ever shot off his gun if he did have a gun. [¶] So even if hypothetically all the evidence you refer to was true and was admitted, in light of all the other evidence and given that initially for hours you gave one version, then you gave a different version to the officers when you were interviewed,

8

I don't believe it would have made any difference. [¶] And in terms of this motion, I believe [defense counsel] has properly and effectively represented you through trial and made strategic choices. He considered different options. And he can't--he has to work with what he's given, including the different versions of the statements and given the physical evidence and given the witness statements. [¶] So I find counsel has properly represented [defendant] and will continue to do so. I find there has not been a breakdown in the relationship between counsel and [d]efendant of such kind that would make it impossible for counsel to properly represent [defendant]."

## DISCUSSION

### I. *Marsden* Claim

Defendant contends that the trial court's denial of his second *Marsden* motion was a prejudicial abuse of discretion. We disagree.

A defendant "may be entitled to an order substituting appointed counsel if he shows that, in its absence, his Sixth Amendment right to the assistance of counsel would be denied or substantially impaired." (*People v. Berryman* (1993) 6 Cal.4th 1048, 1070, citing *Marsden, supra*, 2 Cal.3d at p. 123.) We review the trial court's ruling on a *Marsden* motion for abuse of discretion. *Berryman*, at p. 1070.

When a defendant after trial asks for appointment of new counsel to prepare a new trial motion on the ground of ineffective assistance of counsel, the trial court must conduct a hearing to examine the reasons underlying the request. (*People v. Diaz* (1992) 3 Cal.4th 495, 573.) If the alleged ineffective assistance pertains to matters occurring outside the courtroom, which the trial court could not have observed for itself, and the defendant makes a "colorable claim" that trial counsel was ineffective, the court may exercise its discretion to appoint new counsel to assist the defendant on a new trial motion. (*Id*. at pp. 573-574; accord, *People v. Smith* (1993) 6 Cal.4th 684, 692-695.)

A colorable claim of ineffective assistance of counsel is one which establishes the possibility that trial counsel did not perform with reasonable competence and counsel's

9

incompetence could have adversely affected the outcome. This standard is not met if the claim "is based in substantial part upon factual representations that are manifestly inconceivable, or upon the failure of trial counsel to produce exculpatory evidence that is legally inadmissible or . . . merely cumulative of other evidence tending to exonerate the defendant that was adequately presented to the trier of fact." (*People v. Stewart* (1985) 171 Cal.App.3d 388, 396, disapproved on another point in *People v. Smith, supra*, 6 Cal.4th at p. 696.)

Here, the trial court held a full hearing on defendant's *Marsden* motion. To the extent defendant's ineffective assistance claim depended on matters that occurred in court, the trial court properly drew on its observations, including its notes on the cross-examination of a key witness, to reject defendant's claim. (See *People v. Diaz, supra*, 3 Cal.4th at p. 573.) To the extent the claim depended on matters allegedly occurring outside the courtroom, the court allowed defendant to present whatever evidence and argument he had. Giving defendant the benefit of the doubt, the court then correctly determined that even if all of his alleged exculpatory evidence actually existed, was admissible, and had been presented at trial, it would not have made a difference to the outcome. We agree with the trial court's determination.

First, even assuming that the evidence defendant cited existed and was admissible, it could not have trumped the physical and eyewitness evidence of how the confrontation between defendant and the victim played out, as the trial court found. There was no eyewitness or forensic evidence that the victim had or used a gun on the date of the crime; vague claims that he always or habitually had guns could not have overcome that evidentiary gap. The postal carrier who saw the whole confrontation up to the point of the shooting, testified that defendant had the only gun at the scene, the other person with whom he had been arguing walked away and defendant followed. And defendant's account of a face-to-face shooting at a distance was not reconcilable with the autopsy findings that the victim was shot from behind at close range.

10

Second, as the trial court also found, defendant's evidence could not have overcome his lack of credibility as a witness. He admitted that he lied nonstop to the police.

Defendant asserts that he raised a colorable claim of a defense of provocation and self-defense based on the alleged evidence he cited in his *Marsden* motion, which trial counsel failed to present. But although defendant sets out this evidence, he does not make any developed argument to show that it would have been admissible, which was his burden on the motion and remains so on appeal.[6] (See *People v. Stewart, supra*, 171 Cal.App.3d at p. 396.) Nor does he make any developed argument to show how this evidence, even if admissible, could have bolstered a provocation or self-defense theory to the point that it would have outweighed the physical and eyewitness evidence proving defendant the aggressor, or the evidence of defendant's history of lying and repeatedly changing his story throughout the case.

Defendant has shown no abuse of discretion in the trial court's ruling denying his *Marsden* motion and request for new counsel.

## II. Senate Bill No. 620

The trial court sentenced defendant to a total state prison term of 50 years to life, consisting of 25 years to life for first degree murder plus 25 years to life for personally and intentionally discharging a firearm which proximately caused great bodily injury or death. (§ 12022.53, sub. (d).) At the time of sentencing, imposition of the firearm enhancement was mandatory.

Subsequently, Senate Bill No. 620 (SB 620), signed by the Governor on October 11, 2017 (Stats. 2017, ch. 682, §§ 1-2), amended sections 12022.5, subdivision (c), and 12022.53, subdivision (h), effective January 1, 2018, to allow a trial court to strike or

---

[6] As noted, the trial court did not find he had met this burden, but merely assumed arguendo that he had done so. We are not required to make that assumption.

11

dismiss enhancements thereunder at the time of sentencing. Defendant asks us to remand the matter so that the trial court may exercise that discretion. We shall do so.

The amendment to section 12022.53, subdivision (h), applies retroactively to defendant. (*People v. Robbins* (2018) 19 Cal.App.5th 660, 678-679; *People v. Woods* (2018) 19 Cal.App.5th 1080, 1089-1091.) The Attorney General contends remand is not required because the trial court clearly indicated when it imposed sentence that it would not have stricken the firearm enhancement if it had had the discretion to do so. (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 425 (*McDaniels*) [Remand is required unless the record reveals a clear indication that the trial court would not have reduced the sentence even if at the time of sentencing it had the discretion to do so].)

The Attorney General relies on the trial court's statements that defendant showed no remorse and took no responsibility, that his crime involved great violence, cruelty, and callousness, that the manner in which it was carried out indicated planning, that defendant had engaged in violent conduct which indicated a serious danger to society, and that his prior performance on probation was unsatisfactory. The Attorney General also notes that the court agreed with the harsh characterization of defendant and his acts expressed by the victim's father in a sentencing statement. Specifically, after the victim's father requested the court sentence defendant to the maximum and expressly stated that "50 years to life is not long enough," the court commiserated with the victim's father about the family's loss and then said, "Your points are well taken." The court's statements could be an indication it would not sentence defendant to anything than less than 50 years to life if it had the discretion. However, we cannot say the statements amount to "a clear indication" the trial court would not have struck or dismissed the firearm enhancement had it had the discretion to do so. (*McDaniels, supra,* 22 Cal.App.5th at p. 425.)

Consequently, we shall remand for the purpose of allowing the court to expressly exercise its discretion to strike or dismiss the firearm enhancement in the interest of justice.

## DISPOSITION

The matter is remanded for further proceedings in accordance with part II of the Discussion.  In all other respects, the judgment is affirmed.


/s/

MURRAY, J.

We concur:


/s/

HULL, Acting P. J.


/s/

RENNER, J.

13