Filed 12/5/19

**CERTIFIED FOR PARTIAL PUBLICATION**[*]


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE


| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>JOAQUIN GONZALEZ,<br><br>      Defendant and Appellant. | A150198<br><br>(Alameda County<br>Super. Ct. No. H58965) |


Joaquin Gonzalez appeals following his convictions for assault with a firearm and related crimes. We agree with his contentions that the trial court erred in admitting uncertified, unauthenticated records to prove he suffered a prior felony conviction, and that he is entitled to a remand to allow the trial court to exercise its newly-granted discretion regarding a firearm enhancement. We reject his remaining arguments.

BACKGROUND

A jury convicted appellant of assault with a firearm (Pen. Code, § 245, subd. (a)(2)), shooting at an occupied motor vehicle (*id.,* § 246), and possession of a firearm by a felon (*id.,* § 29800, subd. (a)(1)). As to the assault count, the jury found true an allegation that appellant personally used a firearm during the commission of the offense (Pen. Code, § 12022.5, subd. (a)). The jury also found true an allegation that appellant had a prior felony conviction for attempted second degree robbery (Pen. Code, § 211),

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I, II, IV, and V.

1

which was a serious felony (*id.,* §§ 667, subd. (a)(1), 1192.7, subd. (c)) and a strike (*id.,* §§ 667, subds. (d)(1) & (e)(1), 1170.12, subds. (b)(1) & (c)(1)).

The evidence at trial was as follows. Around 12:20 a.m. on July 3, 2015, a red Buick with a white trunk and white top merged abruptly onto a street after exiting the freeway and nearly collided with a white Nissan. The Nissan was driven by Eli Ortiz, who honked for a few seconds at the Buick.[1] The Buick followed closely behind Ortiz for several streets and then pulled up to the left of Ortiz at a stop sign. Ortiz saw the Buick's front passenger window roll down about six inches and heard a loud popping noise coming from his left. The Buick then drove away. Ortiz pulled over to examine his car and found a hole in the driver's side door. Officers subsequently removed a bullet from the driver's side door.

Wansin Ounkeo, a computer forensic examiner with the Alameda County Sheriff's Office, witnessed the near-collision when the Buick came off the freeway. He followed the two cars and used his cell phone to take a video. The video, which was played for the jury, showed a red Buick with a white trunk and roof. When the Buick pulled up beside the Nissan, Ounkeo heard a loud pop from ahead of him, but did not see a gun or a flash.

In the early evening of July 3, Deputy Jennifer Lema of the Alameda County Sheriff's Office saw appellant driving the Buick. She arrested him for driving with a suspended license. Law enforcement found gunshot residue on the interior passenger window of appellant's car. A search of appellant's cell phone revealed that a picture of the interior passenger compartment of the Buick had been taken at 12:33 a.m. on July 3, approximately 15 minutes after Ounkeo took his video.

Appellant's home was searched and a back license plate with the number 7CHZ518 was found in a closet. This plate was on the Buick in the video taken by Ounkeo. A report from an automated license plate reader program revealed two photos of the Buick with license plate number 7CHZ518, taken on July 2, 2015. When Deputy Lema arrested appellant on the evening of July 3, after the shooting, the Buick had

---

[1] Ortiz testified through an interpreter.

2

different license plates. According to the DMV records and testimony from a DMV manager, appellant had been to the DMV some time before noon on July 3, 2015 and had turned in one license plate bearing number 7CHZ518, completed a form stating the other plate had been stolen, and received new license plates. When questioned about the plates in a May 2016 police interview, appellant told police one of his license plates was stolen and he got new plates "[a]bout a week, I think, a couple days" before his July 2015 arrest.[2]

The day after the shooting, Ortiz told police it was dark and he did not get a good look into the Buick, but the driver was a Latino who had been born in the United States. In December 2015, Ortiz picked appellant out of a photographic lineup as the person who "reminded me more" of the perpetrator. He testified at trial that he felt "a little" pressure to pick someone from the photo lineup, and he was not 100 percent sure when he picked the photograph. In court, Ortiz identified appellant as "resembl[ing]" the Buick driver, but he again was not 100 percent sure appellant was the driver. Ounkeo testified that he could not see into the Buick or identify the driver.

## DISCUSSION

I. *Automated License Plate Reader Program*

Appellant contends that the admission of a report generated by an automatic license plate reader database violated his Fourth Amendment rights. We find any error harmless.

A. *Additional Background*

An automated license plate reader program is used by fifty Bay Area law enforcement agencies. The program uses cameras—either fixed or mounted on patrol cars—to photograph the license plate of every car the cameras encounter. The program reads the license plate numbers and stores the photographs in a database for one year. Law enforcement officers can search the database for a specific license plate number and

_____

[2] A video of the interview was played for the jury and transcripts were provided to the jury.

3

generate a report showing photographs of that number and the date, time, and location of the photograph.

A database search was conducted for license plate number 7CHZ518 (the license plate shown in Ounkeo's video), and the report generated shows two photographs of the license plate on a red car with a white hood, both taken on July 2, 2015. The report was admitted into evidence at trial.

B. *Analysis*

We need not decide whether, as the parties dispute, appellant forfeited this challenge or had a reasonable expectation of privacy in the license plate data.[3] Instead, we conclude that any error in admitting the automated license plate reader report was harmless beyond a reasonable doubt. (*People v. Moore* (2011) 51 Cal.4th 1104, 1128–1129.)

The report showed that appellant's Buick bore license plate number 7CHZ518 on July 2, 2015, hours before the shooting. The sole relevance of this fact, as argued by the prosecutor, was that the jury could infer consciousness of guilt by comparing this evidence to appellant's May 2016 statement to police that he replaced these plates a couple of days or a week before his arrest on July 3, 2015. After discussing other evidence that appellant's statement to police was false—the original plate was in the video taken by Ounkeo, the back plate was not stolen because it was found in his home, and appellant got new plates on July 3, 2015—the prosecutor argued: "We know he tried to have some sort of built-in defense: That couldn't have been his car . . . at the scene of the shooting. He's got different license plates on his car now."

As the prosecutor argued, other evidence proved that appellant's Buick had license plate number 7CHZ518 before the shooting: Ounkeo's video captured the Buick's license plate and showed this number. Even more evidence, in addition to Ounkeo's video,

---

[3] An amicus brief regarding the latter issue was filed by the Electronic Frontier Foundation, American Civil Liberties Union Foundation, and American Civil Liberties Union Foundation of Northern California.

contradicted appellant's statement that his license plates were replaced days before his arrest: DMV records and testimony from the DMV manager showed that appellant got new plates on the morning of the day he was arrested, only hours after the shooting. And yet more evidence contradicted appellant's statement that one of his plates was stolen, supporting the prosecutor's consciousness of guilt argument: appellant had one of the old license plates in a closet and turned the other in to the DMV. Accordingly, we conclude any error in the admission of the automated license plate reader program report was harmless beyond a reasonable doubt.[4]

## II. *Jury Instruction*

Appellant argues it was error to instruct the jury, as part of CALCRIM No. 315, "You've heard eyewitness testimony identifying the Defendant." Appellant contends that, although no eyewitness definitively identified appellant as the perpetrator, "a reasonable juror could interpret the judge's statement as instructing the jury that the testimony was sufficient to qualify as an identification" and it therefore "lessen[ed] the prosecution's burden of proving the defendant's identity."

" 'If a jury instruction is ambiguous, we inquire whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction.' [Citations.] ' " ' "[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." ' " ' [Citation.] The reviewing court also must consider the arguments of counsel in assessing the probable impact of the instruction on the jury." (*People v. Young* (2005) 34 Cal.4th 1149, 1202.)

As described above, Ortiz picked appellant's photo out of a photographic lineup in December 2015, although he testified at trial he was not 100 percent sure and had felt

---

[4] Appellant also argues the prejudice from any error in admitting the automated license plate reader report should be cumulated with prejudice from instructional error (see part II, *post*). As explained below, we reject appellant's claim of instructional error, leaving no prejudice to cumulate.

pressured to pick someone. In addition, Ortiz testified at trial that appellant "resembles" the perpetrator.

We find no reasonable likelihood that the jury construed the challenged instruction in the manner suggested by appellant.[5] First, CALCRIM No. 315, considered as a whole, does not assume that the eyewitness testimony was definitive. To the contrary, the instruction directs the jury to evaluate identification testimony by considering questions such as "Did the witness ever change his or her mind about the identification?"; "How certain was the witness when he or she made an identification?"; and "Was the witness able to identify the Defendant in a photographic lineup?" The instruction also points the jury to factors that, in this case, indicated weakness in the identification: "How well could the witness see the perpetrator?"; "What were circumstances affecting the witness's ability to observe, such as lighting"; and "How much time passed between the event and the time when the witness identified the defendant?"

Second, the prosecutor's closing argument conceded that Ortiz's identification was not conclusive: "[Appellant] was identified in a photo lineup by the victim. Now, I'll tell you the victim said he wasn't 100 percent sure. It was dark that night. He did get a view of him. He did say that. He said it was dark that night, and he wasn't sure. But sure enough, you heard about the procedures that take place in these photo lineups. . . . And sure enough, he selected the Defendant out of the six photos, and he came here into court and identified the Defendant as the person that was driving that car. Again, he wasn't 100 percent sure, but he says that's the person that resembles the person that was driving the car that night." Defense counsel's closing argument further emphasized the uncertainty of the identification.

---

[5] Because we find no error, we need not decide whether, as the parties dispute, appellant forfeited the challenge or was prejudiced by any error.

III. *Prior Conviction*

Appellant contends the trial court erred in admitting uncertified and unauthenticated records to prove his prior conviction. On this issue, we agree with appellant and will reverse the finding.

A. *Additional Background*

A bifurcated jury trial was held on the allegation that appellant suffered a prior strike conviction. Before the trial, the court gave appellant's counsel "the documents the DA indicates he wants to use," including a reporter's transcript from a 2004 plea hearing, a 2004 plea form, and a 2004 minute order. The prosecutor represented that the records were printed from the court's online records system and sought judicial notice of their accuracy and authenticity.[6] Appellant objected, arguing there was no foundation and the documents were not certified copies. The prosecutor responded, "As the Court is aware, we no longer have court files in Alameda County. All of those court files have been scanned and put into the Odyssey system. Asking the Court to take judicial notice of these documents is the same as asking the Court to take judicial notice of the court file that wouldn't have been certified, but would have been here in court and available for all of us to view."

The court reviewed the records, noting that the name of one of the defendants listed in the 2004 records was an alias of appellant's, and that the 2004 minute orders used the same "Personal File Number" to identify appellant as in the current case. The court granted the People's request for judicial notice and the records were provided to the jury.[7] No other evidence was presented on this allegation. The jury found the allegation true.

---

[6] Although the court stated the documents "have been printed out from our Odyssey system," the court was apparently relying on the prosecutor's representation.

[7] The court did not grant the request for judicial notice as to a document setting forth probation terms and conditions, because it deemed this document unnecessary.

7

B. *Analysis*

Evidence Code[8] section 452, subdivision (d), provides for permissive judicial notice of "[r]ecords of . . . any court of this state . . . ." Section 452.5, subdivision (a), provides that these official records "include any computer-generated official court records, as specified by the Judicial Council, that relate to criminal convictions, when the record is certified by a clerk of the superior court pursuant to Section 69844.5 of the Government Code [providing for certification and submission for entry into a computer system operated by the Department of Justice] at the time of computer entry." No such certification was submitted here.

We do not construe section 452.5, subdivision (a), to provide the exclusive means of submitting computer-generated court records for judicial notice. Indeed, subdivision (b) of the same section does not reference section 452, but nonetheless provides for the admissibility of an electronic copy of a record of conviction: "An official record of conviction certified in accordance with subdivision (a) of Section 1530, *or an electronically digitized copy thereof*, is admissible under Section 1280 to prove the . . . prior conviction . . . recorded by the record." (§ 452.5, subd. (b)(1), italics added.)[9] Section 1530, subdivision (a), in turn, provides when a purported copy of a writing is "attested or certified as a correct copy of the writing or entry by a public employee, or a deputy of a public employee, having the legal custody of the writing," the copy is "prima

---

[8] All undesignated section references are to the Evidence Code.

[9] An electronically digitized copy must be an exact reproduction of the original and must either "bear[] an electronic signature or watermark unique to the entity responsible for certifying the document" or be "transmitted by the clerk of the superior court in a manner showing that the copy was prepared and transmitted by that clerk of the superior court." (§ 452.5, subd. (b)(2).)

8

facie evidence of the existence and content of such writing . . . ."[10]  This certification also was not presented here.

Certification serves to authenticate a copy of a writing: "[U]nder sections 1530 and 452.5, subdivision (b), a properly certified copy of an official court record is a self-authenticated document that is presumptively reliable, and standing alone may be sufficient to prove a prior felony conviction."  (*People v. Skiles* (2011) 51 Cal.4th 1178, 1186 (*Skiles*).)  However, "nothing in section 1530 forbids authentication by another method."  (*Skiles*, at p. 1187.)  " 'Authentication of a writing means (a) the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or (b) the establishment of such facts by any other means provided by law.'  (§ 1400.)"  (*Skiles*, at p. 1187.)  "[T]he statutory certification process is a 'means provided by law' establishing that the official writing is the writing that the proponent of the evidence claims it is.  (§ 1400, subd. (b).)"  (*Skiles*, at p. 1187.)  But "[o]ther evidence may establish that a [purported copy of an official writing] is authentic and reliable.  When considered together, the evidence may suffice to prove a prior felony conviction."  (*Ibid.*)  "For example, a writing can be authenticated by circumstantial evidence and by its contents."  (*Ibid.*)

"[T]he proponent of a [noncertified] copy of an official writing has the burden of producing evidence of its authenticity.  Because a noncertified copy of an official writing does not constitute prima facie evidence of the existence and content of such writing under section 1530, the proponent must present additional authenticating evidence."  (*Skiles*, *supra*, 51 Cal.4th at p. 1189; see also *id.* at pp. 1186–1187 ["Since a certified copy of an official writing 'is prima facie evidence of the existence and content of such writing or entry' under section 1530, we may infer that a noncertified copy, by itself, is not reliable enough to constitute such prima facie evidence."].)

---

[10] "For the purpose of evidence, whenever a copy of a writing is attested or certified, the attestation or certificate must state in substance that the copy is a correct copy of the original, or of a specified part thereof, as the case may be."  (§ 1531.)

In *Skiles,* the prosecution introduced "certified copies of court records in [an] Alabama case," including "a single page of an indictment," as well as a "faxed . . . certified copy of the first page of defendant's Alabama indictment, which apparently had been missing" from the other court records and which was necessary to prove the conviction was a serious felony. (*Skiles*, *supra*, 51 Cal.4th at pp. 1182–1183 & fn. 1.) The Supreme Court concluded the faxed record was not certified "[b]ecause the public official did not examine and compare the faxed copy with the original, with a certificate of its correctness." (*Id.* at p. 1186.) However, it considered the certified records and the content of the faxed record, finding the faxed indictment page was "similar to, and consistent with," the certified indictment page "of unquestioned authenticity," in that the count numbering and pagination shown in the two pages was consecutive and the documents showed "the same Alabama court and county, bear the same date, and are certified by the same court clerk." (*Id.* at p. 1188.) In addition, the faxed page "relate[d] to the same counts listed in the grand jury's true bill, another document of unquestioned authenticity." (*Ibid.*) The Supreme Court concluded that this evidence supported "a determination that the [faxed] document . . . was an accurate representation of a court document in the same Alabama case and an authentic representation of counts 1 and 2 of the indictment." (*Ibid.*)

In this case, there were no certified records to compare with the uncertified conviction records. Indeed, no additional evidence at all was presented on the authenticity of the records.

The People note, as they did below, that the trial court no longer kept physical court files, but instead maintained digital copies on the court's own electronic system. To be sure, " '[j]udicial notice ordinarily may be taken of a court's own records . . . .' " (*People v. Cavanna* (1989) 214 Cal.App.3d 1054, 1058.) But the court did not take judicial notice of the digital copies on the court's electronic system, nor did the court print out the records from this system itself. (See *People v. Mendoza* (2015) 241 Cal.App.4th 764, 773, fn. 1 [taking judicial notice of "online San Bernardino and Riverside Superior Courts' dockets"].) Although the prosecutor represented that the

10

records were printed from the court's electronic system, no *evidence* was introduced on this point. (Cf. *People v. Martinez* (2000) 22 Cal.4th 106, 112, 120 [where "uncertified computer printouts of criminal history information" were submitted to prove a prior prison term, a district attorney's office employee testified that, "[s]hortly before testifying, [he] obtained the printout from the Department's CLETS [California Law Enforcement Telecommunications System] computer system"].)

The People also point to the contents of the records as evidence of their authenticity. Our Supreme Court has indicated that the contents of uncertified records alone cannot be sufficient to support a finding of authenticity. (*Skiles, supra,* 51 Cal.4th at pp. 1186–1187 ["Since a certified copy of an official writing 'is prima facie evidence of the existence and content of such writing or entry' under section 1530, we may infer that a noncertified copy, by itself, is not reliable enough to constitute such prima facie evidence."].) Even assuming otherwise, the contents do not support such a finding here. That the records displayed Alameda County Superior Court file stamps and a "PFN" number that was the same one used in appellant's current case is not sufficient, standing alone, to satisfy the prosecutor's burden of establishing the documents were authentic conviction records for the purpose of proving appellant suffered a prior conviction. (See *People v. Goldsmith* (2014) 59 Cal.4th 258, 267 ["The purpose of the evidence will determine what must be shown for authentication, which may vary from case to case."].)

We conclude the trial court erred in admitting the uncertified, unauthenticated exhibits as proof that appellant suffered a prior conviction. As these exhibits were the only evidence presented to prove this allegation, we will reverse the jury's finding for insufficient evidence. "It is well settled that if the jury's finding on a strike allegation is reversed on appeal for insufficient evidence, the allegation may be retried to a new jury." (*People v. Anderson* (2009) 47 Cal.4th 92, 102.) Accordingly, we will remand to permit the People to retry the allegation before a new jury.

11

IV. *Sentencing Factors*

Appellant contends the trial court impermissibly used the same fact to impose the upper term on the assault count and the enhancement for personal use of a firearm. We reject the challenge.

A. *Additional Background*

In sentencing appellant for the assault with a firearm count, the trial court discussed the aggravating and mitigating factors as follows, citing the California Rules of Court: "Rule 4.421(a)(1), the offense involved great violence and threat of great bodily harm. The Defendant fired a gun at an occupied vehicle striking the victim's side door. Fortunately, the bullet was stuck in the door. It was low in the door on the victim's driver side. Had the bullet shot been just a little bit higher, it would have gone through the door seriously injuring and very possibly killed the victim given the large caliber of bullet that was used; [¶] Subsection (a) subsection (2) The Defendant was armed and used a weapon at the time of the commission of the crime. I'm not going to use this as a Circumstance in Aggravation. However, it is noted for the record; [¶] Subsection (b) subsection (1) The Defendant has engaged in violent conduct which indicates a serious danger to society, particularly under these circumstances. The victim merely honked at the Defendant for -- as the Defendant cut him off in a dangerous driving maneuver. In return, the Defendant followed him, stalked him, and got himself in a position where he could then fire a gun towards the driver. All this occurred in a residential neighborhood placing other possible innocent bystanders and victims at risk; [¶] (b)(4) The Defendant was on Court probation when the crime was committed; [¶] (b)(5) The Defendant's prior performance on formal and Court probation was unsatisfactory. He was on Court probation at the time of the arrest, and he had suffered seven probation revocations while on probation." The court found there no mitigating circumstances.

The court sentenced appellant to the upper term of four years. (See Pen. Code, § 245, subd. (a)(2).)

12

B.  *Analysis*

Section 1170, subdivision (b), provides, in relevant part, "the court may not impose an upper term by using the fact of any enhancement upon which sentence is imposed under any provision of law."

Appellant forfeited this claim by failing to object below.  " '[C]omplaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons cannot be raised for the first time on appeal.'  [Citation.]  '[C]laims involving the trial court's failure to properly make or articulate its discretionary sentencing choices' are subject to forfeiture, including '. . . cases in which the court purportedly erred because it double-counted a particular sentencing factor . . . .' " (*People v. Boyce* (2014) 59 Cal.4th 672, 730–731; see also *People v. Sperling* (2017) 12 Cal.App.5th 1094, 1100 [applying forfeiture rule to dual use of facts claim]; *People v. Kurtenbach* (2012) 204 Cal.App.4th 1264, 1292 [same].)

Even if the claim were preserved and meritorious, appellant fails to demonstrate prejudice.  " 'Improper dual use of the same fact for imposition of both an upper term and a consecutive term or other enhancement does not necessitate resentencing if "[i]t is not reasonably probable that a more favorable sentence would have been imposed in the absence of the error." '  [Citation.]  Only a single aggravating factor is required to impose the upper term [citation], and the same is true of the choice to impose a consecutive sentence [citation]." (*People v. Osband* (1996) 13 Cal.4th 622, 728–729.)  Accordingly, where "the court could have selected disparate facts from among those it recited to justify the imposition of both [the enhancement] and the upper term, and . . . [the record reveals] no reasonable probability that it would not have done so[, r]esentencing is not required." (*Id.* at p. 729.)  The trial court found multiple aggravating factors and no mitigating factors.  There is no reasonable probability a more favorable sentence would have been imposed absent the assumed error.

V.  *Newly-Granted Sentencing Discretion*

The trial court imposed a four-year term for the personal use of a firearm enhancement (Pen. Code, § 12022.5, subd. (a)).  Appellant argues (and the People agree)

13

he is entitled to a remand of this enhancement pursuant to new legislation granting trial courts the discretion to strike or dismiss a firearm enhancement.  (Pen. Code, § 12022.53, subd. (h), as amended by Stats. 2017, ch. 682, § 2, eff. Jan. 1, 2018; *People v. Robbins* (2018) 19 Cal.App.5th 660, 679 [Pen. Code, § 12022.53, subd. (h) applies retroactively in cases that are not yet final on appeal on its effective date].)  We will reverse and remand the enhancement to permit the trial court to exercise its discretion.[11]

### DISPOSITION

The finding that appellant suffered a prior felony conviction and the sentence for the firearm enhancement are reversed, and the matter is remanded for proceedings not inconsistent with this opinion.  In all other respects, the judgment is affirmed.

---

[11] Appellant argues he is also entitled to a remand of a prior serious felony enhancement pursuant to new legislation granting trial courts discretion to strike these enhancements. (See *People v. Bipialaka* (2019) 34 Cal.App.5th 455, 464.) We are reversing the prior serious felony conviction for insufficient evidence, rendering this claim moot.

_____

SIMONS, Acting P.J.

We concur.

_____

NEEDHAM, J.

_____

BURNS, J.

(A150198)

15

Superior Court of Alameda County, No. H58965, Hon. Leopoldo E. Dorado, Judge.

Walter K. Pyle, under appointment by the Court of Appeal, for Defendant and Appellant.

Nathan Freed Wessler, Brett Max Kaufman, Jennifer Lynch, Andrew Crocker, Jennifer S. Granick, Vasudha Talla and Matthew Cagle for American Civil Liberties Union Foundation, American Civil Liberties Union Foundation of Northern California and Electronic Frontier Foundation as Amici Curiae on behalf of Defendant and Appellant.

Xavier Becerra, Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Donna M. Provenzano and Melissa A Meth, Deputy Attorneys General, for Plaintiff and Respondent.