Filed 2/22/21  P. v. Alvarado CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>ALEJANDRO ALVARADO,<br><br>　　　Defendant and Appellant. | B298355<br><br>(Los Angeles County<br>Super. Ct. No. NA103415) |

APPEAL from a judgment of the Superior Court of Los Angeles County, James D. Otto, Judge.  Affirmed.

Tanya Dellaca, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, and Michael R. Johnsen and Yun K. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

Alejandro Alvarado appeals his convictions for murder and attempted murder.  He argues the trial erred in refusing to instruct the jury on heat of passion, both to reduce murder to manslaughter and to reduce first degree murder to second degree murder.  He also argues his trial counsel provided ineffective assistance by failing to ask the trial court at sentencing to impose a lesser included firearm enhancement.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.   *Someone Fires Shots at the Empty Home of Alvarado's Friends*

Kaleah Smith, Zariah McCollum, and Zaria Tate lived together in Joyce Bryant's house.  Smith lived in a back room with her baby son.  Tate was Bryant's daughter and McCollum's childhood friend.  Alvarado was a friend of McCollum and occasionally visited the house.

One day McCollum's cousin, Mariah Johnson, was at the Bryant house and received messages from Jason Beaulieu on social media.  McCollum described her relationship with Beaulieu as "something close to friends with benefits"; they "started off as friends" and then "ended up having sexual intercourse." Beaulieu's message to Johnson, which McCollum read, stated that he, Beaulieu, wanted to put a bullet in her, Johnson's, head. At some point after Beaulieu sent this message, McCollum, Smith, Tate, and Johnson all left the house.

The women (minus Johnson) returned in the early evening between 6:30 p.m. and 7:00 p.m. and noticed debris on the floor of the house.  They found eight bullet holes in the house and a shell

on the floor, and concluded someone had fired shots into the home. Smith was upset because her infant son, who was not home at the time, could have been injured had he been there. McCollum, Smith, and Tate, assuming Beaulieu "had something to do with it" because of the messages he sent Johnson earlier that day, walked to a nearby housing project to confront him.

B. *Smith Accuses Beaulieu of Shooting at the House*

McCollum, Smith, and Tate found Beaulieu and his friend Jacob James at the housing project. Smith was angry because she thought Beaulieu was the one who had fired the shots into the house. Smith questioned Beaulieu loudly and aggressively, asking him repeatedly whether he fired shots into the Bryant house and saying her son could have been hit by one of the bullets. After screaming and yelling at Beaulieu, Smith began to hit him. Beaulieu did not fight back, and James ran away. Eventually Smith, McCollum, and Tate returned to the Bryant house with their friend Devontae Reynolds, who had been "in the crowd" watching the incident at the housing project.

C. *Alvarado Shoots at Beaulieu and James*

McCollum left the Bryant house and began walking through the neighborhood. The others went to look for her in two cars, one driven by Reynolds (who drove Smith and Tate) and one driven by an individual identified only as "Poppy" (who saw McCollum walking and stopped to pick her up). The two cars "ended up" on a street near the housing project, where at approximately 10:00 p.m. the group encountered Alvarado. Smith told Alvarado "exactly what happened as to the house being shot up," and Alvarado got into Poppy's car with McCollum.

3

The group met back at the Bryant house, although Reynolds left with Smith for a few minutes.

When Reynolds and Smith returned, McCollum and Alvarado got into Reynolds's car to drive back to the housing project. Reynolds was driving, Smith was in the front passenger seat, McCollum was in the back seat behind Reynolds, and Alvarado was behind Smith.[1] En route, McCollum saw Reynolds pull out a gun, which "eventually ended up" in Smith's hands.

The group found Beaulieu and James sitting on some stairs in front of a building. Reynolds drove the car around the back of the project, while Smith and Alvarado debated who was going to shoot Beaulieu. Smith said she wanted to shoot Beaulieu because he "shot up the house." She said that Beaulieu deserved to be shot "because her son could have been in the house and . . . could have easily caught one of those bullets that went flying inside of the house" and that she wanted to make sure there was not going to be a "next time." Alvarado told Smith he wanted to shoot Beaulieu for her. Eventually, Alvarado "won that argument," and they switched seats, with Alvarado moving to the front seat, where there was a bigger window and he would have a better shot at Beaulieu, and Smith going to the back seat.

Reynolds drove back to the housing project, waited until a car passed and "it was clear," and slowly approached the stairs where Beaulieu and James were sitting. It was approximately 11:00 p.m. Alvarado rolled down the window and said to Smith, "This is for your son." He told McCollum and Smith to duck, held the gun in both hands, and began shooting. Smith got up and said, "I want to see this." From her position in the car, McCollum

---

[1] The significance of the seating in the car will become apparent.

saw Alvarado's hand holding the gun, saw "fire coming out of the gun," and heard five or six shots.

When Alvarado stopped shooting, Reynolds accelerated and drove away. A witness heard screeching and the sound of tires burning rubber. Alvarado was excited and said he thought he shot both Beaulieu and James. Alvarado said, "I got him for you," which McCollum understood meant he was saying to Smith that he shot Beaulieu for the safety of Smith and her son.

The four friends went to Reynolds's house, where Reynolds said he was going to get rid of the gun. When he returned to the car, they went to a gas station to smoke marijuana. Smith said that they could never discuss what happened and that "this has to stay between us." They went back to the housing project to make it seem as though they did not know about, and were not involved in, the shooting. McCollum saw Beaulieu's body at the crime scene.

McCollum, Smith, and Alvarado returned to the Bryant house. Alvarado told Bryant that Beaulieu was "no más," made a gesture to imitate a gun and said "pow," and moved his hand across his neck to indicate Beaulieu was dead. Alvarado said that "the girls wouldn't do it, so he did it" and that he got rid of the gun. Smith told Bryant she would not have to worry anymore about having shots fired at her house. Smith, McCollum, and Alvarado again vowed not to talk about the shooting. Smith praised Alvarado and called him her man, her hero, and her "Trojan." She took Alvarado's hand, led him to her room, and said that, if he ever needed anything, he could rely on her because he had done her a favor. After the shooting, Alvarado and Smith "became boyfriend and girlfriend," and Alvarado

moved in with Smith until a few weeks before they were arrested.[2]

When the police arrived Beaulieu was not breathing. Beaulieu died from a gunshot wound to the head. He also suffered a gunshot wound to the left leg. James left the scene before the police arrived.

> D. *Alvarado, Smith, Reynolds, and McCollum Are Arrested, and Alvarado and Reynolds Make Incriminating Statements to Jailhouse Informants*

Several months after the shooting, the police arrested Alvarado, Smith, and Reynolds and searched Reynolds's car and residence. McCollum came with her attorney to the police department to meet with a detective and a prosecutor for a recorded interview, called a "proffer session," in which she recounted the details of how Alvarado shot Beaulieu.

The police also recorded a jailhouse conversation between Alvarado and a police informant posing as another inmate. Alvarado admitted that he killed Beaulieu, that Smith, Reynolds, and McCollum were involved, and that Reynolds was the driver.

---

[2] Most of the facts of the shooting came from McCollum, who testified at trial after she agreed to cooperate, pleaded guilty to murder, and received a prison sentence of 11 years. She originally lied to detectives investigating the shooting, but decided to tell the truth because she felt "what was done in the dark eventually comes to the light," she "wanted justice done" and knew what they did was wrong, and "it's not up to us to decide when it's time for somebody to die." She also felt there were "only two things coming [her] way . . . death or life in prison." Reynolds exercised his rights under the Fifth Amendment and did not testify.

6

Alvarado explained that Beaulieu had fired shots into the house where Smith lived.  Alvarado said that he shot at Beaulieu six times ("in the heart, in the chest, everything") and that he saw "the whole thing when he dropped."  In a separate recorded jailhouse conversation, Reynolds admitted they used his car and his gun to kill Beaulieu.  Reynolds said that the shooter, Alvarado, was in the front passenger seat and that Smith and another woman were in the back seat.

E.      *A Jury Convicts Alvarado of Murder and Attempted Murder, and the Trial Court Sentences Him*

The People charged Alvarado with one count of murder and one count of attempted murder.  The People also alleged Alvarado personally used a firearm within the meaning of Penal Code section 12022.53, subdivision (b),[3] personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivision (c), and personally and intentionally discharged a firearm causing great bodily injury or death within the meaning of section 12022.53, subdivision (d).[4]  The People also alleged Alvarado committed the crimes for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members, within the meaning of section 186.22, subdivision (b).

Trial counsel for Alvarado asked the court to give CALCRIM No. 570, voluntary manslaughter based on heat of

---

[3]      Statutory references are to the Penal Code.

[4]      The significance of the fact the People alleged all three firearm enhancements under section 12022.53 will become apparent.

7

passion, CALCRIM No. 603, attempted voluntary manslaughter based on heat of passion, and CALCRIM No. 522, effect of provocation on the degree of murder. When the court pointed out that counsel for Alvarado was referring to Smith's passion, not Alvarado's, counsel for Alvarado responded, "Yes, but it transfixes the people around her, . . . [w]hich makes them passionate." Counsel asserted that Smith's passion was "infectious to" Alvarado and that, because there was "constant movement without any break" and the "passion [was] still roaring," there was no "cool-off period." The court refused to give CALCRIM Nos. 570 and 603 stating: "I don't believe this is a heat of passion case. I don't believe voluntary manslaughter is appropriate." The court also refused to give CALCRIM No. 522, stating: "I don't see there being any provocation. There's certainly no provocation by the victim. You're talking about somehow encouragement [by an] accomplice in the crime. That's not provocation."

The jury convicted Alvarado of first degree murder and attempted willful, deliberate, and premeditated murder, and found true the firearm enhancement under section 12022.53, subdivision (d), for the murder conviction, and found true the firearm enhancement under section 12022.53, subdivision (c), for the attempted murder conviction. The jury found the gang allegations not true.

The trial court sentenced Alvarado on the murder conviction to a prison term of 25 years to life, plus 25 years to life for the firearm enhancement under section 12022.53, subdivision (d). The court sentenced Alvarado on the attempted murder conviction to a consecutive term of life in prison, plus 20

8

years for the firearm enhancement under section 12022.53, subdivision (c). Alvarado timely appealed.

## DISCUSSION

A.  *The Trial Court Did Not Err in Refusing To Instruct the Jury on Heat of Passion*

Alvarado argues the trial court erred in refusing to instruct the jury on the lesser included offenses of voluntary manslaughter and attempted voluntary manslaughter based on heat of passion (CALCRIM Nos. 570 and 603) and in refusing to instruct the jury that provocation may reduce the degree of murder from first degree to second degree (CALCRIM No. 522). Alvarado argues that Smith had an emotional reaction to discovering shots had been fired into the house where she lived, that her infant son could have been killed, and that "her passion transferred to the people around her, including" Alvarado, who in turn "was acting in the heat of passion when he fired the gun at Beaulieu and James." Alvarado contends his "emotional reaction to his girlfriend, her infant and himself being placed at risk of being shot" incited him "to homicidal conduct in the heat of passion."

1.  *Applicable Law*

"'Murder is the unlawful killing of a human being, or a fetus, with malice aforethought.'" (*People v. Morales* (2020) 10 Cal.5th 76, 88.) "Voluntary manslaughter, a lesser included offense of murder, is defined as the unlawful killing of a human being without malice. [Citations.] Manslaughter instructions are warranted when substantial evidence exists to support a jury's determination that the killing was committed in the heat of passion and thus does not constitute a first degree murder."

9

(*People v. Vargas* (2020) 9 Cal.5th 793, 827; see *People v. Smith* (2018) 4 Cal.5th 1134, 1163.)

      "'Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter.' [Citation.]  Heat of passion killing is distinct from malice murder because thought in some form is necessary 'to form either an intent to kill or a conscious disregard for human life.' [Citation.]  A heat of passion killing . . . is one caused by an unconsidered reaction to provocation rather than the result of rational thought.  If reason ""was obscured or disturbed by passion"'" to so great a degree that an ordinary person would ""act rashly and without deliberation and reflection,"'" . . . that killing arose from ""passion rather than from judgment.""'" (*People v. Vargas*, *supra*, 9 Cal.5th at pp. 827-828; see *People v. Soto* (2018) 4 Cal.5th 968, 974; *People v. Nelson* (2016) 1 Cal.5th 513, 539; *People v. Avila* (2009) 46 Cal.4th 680, 705.)  "While some measure of thought is required to form either an intent to kill or a conscious disregard for human life, a person who acts without reflection in response to adequate provocation does not act with malice." (*People v. Beltran* (2013) 56 Cal.4th 935, 942.)

      "'The heat of passion requirement for manslaughter has both an objective and a subjective component. [Citation.]  The defendant must actually, subjectively, kill under the heat of passion. [Citation.]  But the circumstances giving rise to the heat of passion are also viewed objectively . . . .  "[T]his heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances . . . ."'" (*People v. Rountree* (2013) 56 Cal.4th 823, 855.)  "'To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection. . . .  [T]he anger or other passion

must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene.' [Citation.] '[P]rovocation is sufficient not because it affects the quality of one's thought processes but because it eclipses reflection.'" (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 650.)

Heat of passion arising from provocation may also negate premeditation and deliberation and reduce first degree murder to second degree murder. (*People v. Rivera* (2019) 7 Cal.5th 306, 328; *People v. Rogers* (2006) 39 Cal.4th 826, 877-878.) But the "'test of whether provocation or heat of passion can negate deliberation and premeditation so as to reduce first degree murder to second degree murder . . . is subjective.'" (*People v. Robbins* (2018) 19 Cal.App.5th 660, 674; see *People v. Hardy* (2018) 5 Cal.5th 56, 100 [provocation that makes the defendant act in a sudden heat of passion can negate deliberation and premeditation].)

2.     *Substantial Evidence Did Not Support Giving an Instruction on Heat of Passion*

There was no evidence that, at the time of the shooting, Alvarado "was subjectively roused to 'the actual influence of a strong passion'" or a "'"[v]iolent, intense, high-wrought or enthusiastic emotion."'" (*People v. Smith*, *supra*, 4 Cal.5th at p. 1166.) Nor was there evidence that Alvarado's reasoning or thought process was obscured by passion or that he acted without reflection or with unconsidered reaction to provocation. To the contrary, Alvarado acted rationally and with considered judgment. After he learned about the shooting at the Bryant house, he returned there with McCollum, Reynolds, and Smith, waited for Reynolds and Smith to return with the gun, and

11

planned with his three friends to return to the housing project and find Beaulieu. When they arrived, Alvarado had a rational, calculated discussion with Smith over which one of them was going to shoot Beaulieu, waited patiently with Reynolds for the area to clear before approaching Beaulieu in Reynolds's car, and rolled down the window as Reynolds drove slowly past the victims. The reason Alvarado gave Bryant for shooting Beaulieu was not that he was passionately upset about anything, but that "the girls wouldn't do it." The only time Alvarado showed any significant emotion was after the shooting as Reynolds drove away from the scene, when Alvarado was excited about having shot two people, and back at the Bryant house, when Alvarado told Bryant that Beaulieu was "no more" and made a slit-throat gesture indicating Beaulieu was dead. Hardly substantial evidence Alvarado actively and subjectively killed in the heat of passion.

Nor would whatever provocation or emotion Alvarado may have felt after learning about the shooting incident at the Bryant house have caused a reasonable person, upon hearing the news, to react without reflection by hunting down Beaulieu and killing him. Yes, Smith was upset about the incident and had argued with Beaulieu about it. And yes, Alvarado may have been concerned his friend and her baby could have been injured had they been home. But it was not his home, it was not his baby, and (before he shot Beaulieu) Smith was not his girlfriend. He was not present at, and nearly four hours had passed since, the shooting at the Bryant house. An ordinary person, after learning what Alvarado learned about the Bryant house incident, would not have become so infected with Smith's emotions that all reason and reflection would have been obscured. A reasonable

person in Alvarado's position would not have reacted by planning a retaliatory shooting, hunting down his intended victim, debating with a confederate who was going to fire the shots, and executing a surprise attack on victims who may not have had anything to do with the prior incident.

Moreover, to the extent Smith was able to "transfer" her passion to Alvarado, there was plenty of time for Alvarado to cool down and reflect on what he was doing.  (See *People v. Rangel* (2016) 62 Cal.4th 1192, 1225 ["""if sufficient time has elapsed for the passions of an ordinarily reasonable person to cool, the killing is murder, not manslaughter"""]; *People v. Moye* (2009) 47 Cal.4th 537, 550 ["""if sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter"""]; *People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1139 ["'[i]f sufficient time has elapsed for one's passions to "cool off" and for judgment to be restored,' malice is not negated"].)  Between when he learned from Smith about the Bryant house shooting and when he killed Beaulieu, which was about an hour, Alvarado returned to the house, waited there until Reynolds and Smith arrived with the gun, drove to and around the housing project searching for Beaulieu, stopped in a side street to debate with Smith who should be the shooter and to change seats, waited for cars to clear the area, and slowly drove up to the stairs where Beaulieu was sitting with James.  There was more than enough time for whatever passion Alvarado may have felt (and even more time for the anger of Smith, the purported source of Alvarado's passion) to dissipate, and "'for the blood to cool and reason to resume its habitual control.'" (*People v. Beltran*, *supra*, 56 Cal.4th at pp. 946-947.)

13

B.  *Alvarado Has Not Shown His Trial Counsel Provided Ineffective Assistance at Sentencing*

Citing *People v. Morrison* (2019) 34 Cal.App.5th 217, disagreed with by *People v. Garcia* (2020) 46 Cal.App.5th 786, review granted June 10, 2020, S261772 and *People v. Tirado* (2019) 38 Cal.App.5th 637, review granted November 13, 2019, S257658, Alvarado argues his trial counsel provided ineffective assistance at sentencing by failing to ask the court to impose lesser included firearm enhancements.  Alvarado argues "no tactical reason could excuse" his trial counsel's failure to ask the court to impose a 10- or 20-year firearm enhancement under section 12022.53, subdivision (b) or (c), rather than the 25-years-to-life enhancement the court imposed under section 12022.53, subdivision (d), on his murder conviction, or to impose the 10-year firearm enhancement under section 12022.53, subdivision (b), rather than the 20-year enhancement the court imposed under section 12022.53, subdivision (c), on the attempted murder conviction.

We need not wait until the Supreme Court decides whether the trial court has (*People v. Morrison*) or does not have (*People v. Garcia* and *People v. Tirado*) discretion to impose a lesser included firearm enhancement under section 12022.53 on which the jury did not make a finding, because Alvarado cannot show prejudice.  To establish ineffective assistance of counsel, "'"a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant.  [Citation.]  'A reasonable probability is a

14

probability sufficient to undermine confidence in the outcome.'""" (*People v. Rices* (2017) 4 Cal.5th 49, 80; see *In re Gay* (2020) 8 Cal.5th 1059, 1086; *People v. Sepulveda* (2020) 47 Cal.App.5th 291, 301.) "If a claim of ineffective assistance of counsel can be determined on the ground of lack of prejudice, a court need not decide whether counsel's performance was deficient." (*In re Crew* (2011) 52 Cal.4th 126, 150; see *Strickland v. Washington* (1984) 466 U.S. 668, 697 [104 S.Ct. 2052, 80 L.Ed.2d 674] ["a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies," and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed"].)

At sentencing, the trial court stated: "I've considered, as I now have discretion to do, the gun allegations and the request to strike them. This is a case that I clearly think demonstrates when gun allegations should not be stricken. I'm exercising my discretion not to strike any of the gun allegations." The court also stated: "I've listened to your arguments, considered all the submissions, looked at the California Rules of Court factors. I find no factors in mitigation in this case. The motivation of the defendant was undoubtedly skewed, but [it was a] bad choice, very bad choice, and personally [a] bad choice when you talk about the fact that the person he was shooting at after he persuaded Ms. Smith to give him the gun because he, as I recall, was the better shot, was somebody that he knew, that he had had dinner at his house. It's shocking to me." The court proceeded to impose maximum sentences and firearm enhancements on both convictions and ordered Alvarado to serve them all consecutively. Given the court's statements and sentencing decisions, the record

15

clearly indicates that, even if trial counsel for Alvarado had asked the court to impose lesser firearm enhancements on the two convictions, the court would not have done so. (See *People v. Windfield* (2021) 59 Cal.App.5th 496, 530; *People v. Yanaga* (2020) 58 Cal.App.5th 619, 628.)

## DISPOSITION

The judgment is affirmed.

SEGAL, J.

We concur:

PERLUSS, P. J.

FEUER, J.