Filed 8/3/22  P. v. Smith CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D079350 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN399026) |
| ANDREW THOMAS SMITH, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Sim von Kalinowski, Judge.  Affirmed in part, reversed in part, and remanded for resentencing.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Warren J. Williams, Deputy Attorneys General, for Plaintiff and Respondent.

# I

# INTRODUCTION

Andrew Thomas Smith shot his wife in the neck and killed her while she was seated at a desk in the couple's home watching a video on her computer. A jury convicted Smith of first degree murder (Pen. Code, § 187, subd. (a)),[1] and found he personally and intentionally discharged a firearm and proximately caused the death of his wife (§ 12022.53, subd. (d)). The trial court sentenced Smith to an indeterminate term of 50 years to life in state prison, consisting of a term of 25 years to life for the murder conviction and a consecutive term of 25 years to life for a firearm enhancement.

Smith concedes he killed his wife. However, he argues we should reduce his first degree murder conviction to a voluntary manslaughter conviction because there was insufficient evidence he acted with malice. In particular, he contends he shot his wife in a heat of passion after enduring years of verbal abuse and emasculation at her hands. Alternatively, he claims we should reduce his first degree murder conviction to a second degree murder conviction because there was insufficient evidence of premeditation and deliberation. We reject both of these arguments and affirm the first degree murder conviction.

Additionally, Smith asserts he is entitled to a resentencing proceeding so the trial court may consider whether to strike the firearm enhancement and, in its place, impose a lesser firearm enhancement. We agree resentencing is warranted. Therefore, we reverse the judgment, in part, and remand the matter for resentencing purposes only. In all other respects, the judgment is affirmed.

---

[1] Further undesignated statutory references are to the Penal Code.

## II

## BACKGROUND

One evening, Smith called 911 and calmly reported he shot and killed his wife of two decades, Jean Smith (hereafter, Jean).[2] Smith was arrested and charged with first degree murder.

### A

### *Prosecution Case*

The prosecution elicited testimony from three sheriff's deputies who responded to the 911 dispatch on the night of the killing—Nathan McKemy, Charles Eglin, and April Gaines. It also elicited testimony from the lead homicide detective for the case, Sergeant Jacob Wilson, and two criminalists from the sheriff's crime laboratory, Raegan Carter and Roland Chang.

Deputy McKemy testified he arrived at the Smith residence and handcuffed Smith upon arrival. He testified he entered the home and found Jean slouched over in a chair at a desk in the living room. She was nonresponsive and there was blood on her shoulders and chest, which dripped down her body. She was clutching a computer mouse in her hand and there was a pair of headphones at her feet. A video was playing on the computer screen in front of her. There was also a second desk adjacent to the desk at which Jean was seated. A firearm and a computer monitor displaying a Solitaire card game sat atop the adjacent desk.

Deputy Eglin testified he arrived at the Smith residence while Smith was being detained. He testified he entered the home and observed Jean seated in a chair at a desk. She was bloody and unresponsive, and she "appeared to have a gunshot wound in the back of her head." Like deputy

---

2 The defendant and the victim share the same surname. To avoid confusion, we will refer to the victim by her first name.

McKemy, deputy Eglin testified Jean had a computer mouse in her hand and a video was playing on a computer screen in front of her. He testified he observed a firearm on the desk adjacent to Jean's desk.

Deputy Gaines testified Jean was declared dead at the hospital an hour after Smith called 911. The San Diego County Medical Examiner performed an autopsy of Jean the day after she died. The parties read into evidence a stipulation that Jean suffered a single perforating gunshot wound of the neck. The stipulation stated the direction of the bullet was back to front, right to left, and downward. It stated the cause of death was a gunshot wound to the neck and the manner of death was homicide.

The parties read into evidence another stipulation that a blood draw was performed on Smith seven and a half hours after his arrest. The stipulation stated that testing of the blood sample showed Smith had a blood alcohol concentration (BAC) of 0.97, plus or minus 0.005, at the time of the blood draw. Carter, a criminalist from the sheriff's crime laboratory, testified about the blood draw results as well. Based on calculations that considered Smith's body weight and alcohol burn-off rate, Carter estimated Smith's BAC was between 0.15 and 0.28 when he was arrested.[3]

The Medical Examiner drew a blood sample from Jean during the autopsy. At trial, the parties read into evidence a stipulation that testing performed on the blood sample revealed a BAC of 0.17. Carter testified the liver stops metabolizing alcohol at the time of death. However, Carter could

---

[3]     The parties read into evidence a stipulation that Smith's blood sample also tested positive for cannabinoids with 1.4 nanograms per milliliter delta-9-THS, 1.0 nanograms per milliliter 11-hydroxy-delta-9-THC, and 31 nanograms per milliliter 11-carboxy-delta-9-THC. According to Carter, these were "low" cannabinoid levels.

not estimate Jean's BAC at the time of her death because passive diffusion of molecules across cellular membranes can occur after death.

Chang, a criminalist in the firearms unit of the crime laboratory, testified the firearm found in the Smith residence was a semiautomatic pistol. He testified one bullet and one cartridge case were recovered from the crime scene. He testified the killer likely fired the bullet at a distance of at least two feet from Jean's chair. In forming this conclusion, he relied on the fact that Jean's chair did not have soot or particles on it, which likely would be present if the firearm had been fired within two feet of it.

Sergeant Wilson was the lead detective for the sheriff's department in its investigation into Jean's death. Sergeant Wilson testified he searched the Smith home the night of the killing and found Smith's belongings in the master bedroom and Jean's belongings in a different bedroom across the hall. He testified he did not observe any signs of struggle in the home. In particular, he testified there was no broken furniture and there was an undisturbed layer of dust on most of the crime scene surfaces.

B

*Defense Case*

Smith testified in his own defense. He testified that he and Jean met online in 1999, married in 2000, and moved into their home in 2001. He testified she had an adult son from a prior marriage and the three of them lived together in the family home.

According to Smith, several events negatively impacted Jean's emotional and physical wellbeing during the marriage. He testified she became "unhappy" and "depressed" when two family members passed away and she was laid off from a job she enjoyed. He testified she gained weight,

suffered from gastrointestinal problems, and started drinking heavily.  He testified she also suffered two debilitating shoulder injuries.

Smith described three instances in which Jean allegedly tried to attack him during the marriage.  He testified that, on one occasion, she got "super angry" at him, he went into the bathroom, and she struck the bathroom door with a golf club to try to gain entry.  He testified that, on another occasion, she tried to "hack her way through the bedroom door with a knife when she was drunk."  He testified that, on a third occasion, she drank all night, got "furiously angry" with him, and hit him with a table lamp.  Jean called 911 after the lamp incident and was arrested for domestic violence.

Smith testified Jean became "very abusive" and "very angry" as the years progressed.  According to Smith, she swore at him, called him names, and told him he was never "good enough" for her.  He testified that, especially in the years immediately preceding the killing, she "was drinking almost all the time," and there was "constant yelling" and "verbal abuse" directed towards him.  He testified he began drinking more as well, and he typically would consume "three or four drinks in the evening" after work.

Smith sometimes took videos of Jean's drunken interactions with him, ostensibly to play them for her when she was sober.  Three of the videos were played for the jury.  In each video, Jean is depicted belittling Smith, calling him names, and cursing at him.  In one video, for example, Jean calls Smith "fat, ugly, and stupid," an "idiot douche bag," an "asshole," a "little fucking pussy-boy," a "little child," the "stupidest man on the face of the earth," an "idiot," a "little wuss," and a "baby ass," among other demeaning names. Smith testified the interactions depicted in the videos were fairly representative of the interactions he and Jean had in the years preceding the

6

killing. He testified he would not engage with Jean or yell back at her during these interactions.

Smith admitted he owned the firearm that was found on his desk. He testified he bought the gun two years earlier for home protection because there were drug and gang violence problems in the neighborhood. He testified he usually carried the firearm on his person when he was at home and left it locked inside his bedroom when he went to work.

Smith testified he and Jean had a good day together before he killed her. He testified they even hugged, kissed, and watched a movie. As the day progressed, they drank alcohol and Smith got "quite drunk." Smith testified that Jean asked her son to buy more alcohol from the store and pay for it with her credit card. Smith testified he did not want Jean to give her credit card to her son because he was diabetic and Smith was worried he would use the credit card to buy sugary food and drinks. Smith testified he offered to give Jean's son just enough cash to buy alcohol.

According to Smith, Jean became "furiously angry" and began "yelling and screaming." He testified she yelled and name-called in the "regular" way, but he could not remember what she said. He testified he stood up from the desk where he was playing Solitaire and walked towards the bedroom intending to get cash for Jean's son, but then turned towards Jean, took his firearm out of his pocket, and shot her instead. He testified he "lost [his] temper" and he "had enough at that time." He testified he then "put the gun down on the desk" and called 911 because he had made a "terrible mistake."

The defense elicited testimony from three neighbors who lived near the Smith residence. One neighbor testified she heard yelling and screaming from the Smith residence two to four times per week, and Jean screamed louder and more often than Smith. A second neighbor testified "the female"

7

at the Smith residence would yell, hurl "verbal abuse," and scream "terrible things … like, 'you should kill yourself.' " A third neighbor testified she heard yelling and profanities from the Smith residence, which increased over time. She testified she heard Jean yelling and using profanities more often than Smith, but he yelled and used profanities too. All three neighbors testified they never witnessed physical violence between Smith and Jean, nor did they feel compelled to call law enforcement.

## C

### *Rebuttal Case*

The prosecution recalled Sergeant Wilson as its sole rebuttal witness. Sergeant Wilson testified he recovered a video file from a digital camera at the Smith residence contradicting Smith's testimony that he did not yell at Jean during their interactions. The video file was created less than one week before Smith killed Jean.

The video was played for the jury. The video depicts Smith and Jean both hurling insults at one another and arguing about money. It depicts Smith calling Jean derogatory names including "asshole," "horrible bitch," "dumbass bitch," and "stupid idiot." Further, it depicts him stating he did not "give a fuck" about her, she was "mean and evil," and she did not "deserve to be [his] wife." At one point, it depicts Smith telling Jean, "Why - why don't you just shoot yourself in the fucking head?"

## D

### *Verdict and Post-Verdict Proceedings*

The jury was instructed on three alternative theories of liability: premeditated and deliberate first degree murder, second degree murder, and voluntary manslaughter under a heat of passion theory. After hardly more than an hour of deliberations, the jury found Smith guilty of first degree

murder. It also found he personally and intentionally discharged a firearm and proximately caused his wife's death.

Thereafter, Smith moved to modify the verdict under section 1181(6). He asked the trial court to reduce the first degree murder conviction to a voluntary manslaughter conviction or, in the alternative, a second degree murder conviction.

The court denied the motion, finding the prosecution proved beyond a reasonable doubt that Smith did not act rashly and under intense emotion obscuring his reasoning or judgment. In support of this finding, the court referenced Smith's concession that there was nothing unusual about the couple's interaction before he shot her; the innocuous subject matter of the argument preceding the killing (whether to give Jean's son a credit card or cash); the fact Jean was seated in her chair turned away from Smith when he shot her; Smith's "remarkably calm" demeanor on the 911 call; and Smith's statement to Jean that she should shoot herself in the head. Relying largely on the same factors, the court found the purported provocation would not have caused a person of average disposition to act rashly and without due deliberation.

The trial court also found there was sufficient evidence of premeditation and deliberation giving rise to a first degree murder conviction in lieu of a second degree murder conviction. In support of this finding, the court cited the following factors: Smith's statement that Jean should shoot herself in the head; the fact Smith halted as he was walking away from Jean and turned around to shoot her; the fact Smith aimed and fired at the back of Jean's head; the "execution-style" manner by which Smith killed Jean, who was turned away, unaware of the danger, and unable to take defensive action; and Smith's calm demeanor when he reported the killing to 911.

9

III

DISCUSSION

A

*Substantial Evidence Supported the Finding of Malice*

Smith asks us to reduce his first degree murder conviction to a voluntary manslaughter conviction. He claims the reduction is warranted because substantial evidence did not establish that he acted with malice when he shot Jean. In particular, he argues there was insufficient evidence to disprove that he was acting under the influence of a heat of passion.

"California statutes have long separated criminal homicide into two classes, the greater offense of murder and the lesser included offense of manslaughter. The distinguishing feature is that murder includes, but manslaughter lacks, the element of malice. (Compare § 187, subd. (a) ['[m]urder is the unlawful killing of a human being ... with malice aforethought'] with § 192 ['[m]anslaughter is the unlawful killing of a human being without malice'].)" (*People v. Rios* (2000) 23 Cal.4th 450, 460.)

Heat of passion is a mental state that precludes the formation of malice. (*People v. Vargas* (2020) 9 Cal.5th 793, 827.) Heat of passion is " 'a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation.' " (*People v. Nelson* (2016) 1 Cal.5th 513, 539 (*Nelson*), quoting *People v. Beltran* (2013) 56 Cal.4th 935, 942 (*Beltran*).)

"Heat of passion arises if, ' "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." ' " (*Beltran, supra,* 56 Cal.4th at p. 942.) This standard

encompasses both subjective and objective components.  For the subjective component to be satisfied, " '[t]he defendant must actually, subjectively, kill under the heat of passion.' " (*People v. Rountree* (2013) 56 Cal.4th 823, 855; see *Beltran*, at p. 951 ["a defendant [must] *actually* be motivated by passion in committing the killing"].)  For the objective component to be satisfied, "[t]he facts and circumstances must be ' "sufficient to arouse the passions of the ordinarily reasonable man." ' " (*Nelson, supra*, 1 Cal.5th at p. 539.)

As noted, Smith claims his murder conviction should be reduced because substantial evidence did not establish the element of malice—i.e., he argues there was insufficient evidence to prove he acted while he was not under the influence of a heat of passion.  " ' "The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]  On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' " (*People v. Morales* (2021) 69 Cal.App.5th 978, 988.)  Reversal is not required unless " 'it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' " (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)

Applying these standards of review, we conclude there was sufficient evidence from which a rational jury could conclude Smith was not acting under the influence of a heat of passion.  Smith testified he spent an enjoyable day with Jean the day she died and they even hugged, kissed, and watched a movie.  He testified she became agitated and began "yelling and screaming" after he objected to her giving her credit card to her son.  However, by Smith's admission, Jean did not say or do anything out of the

11

ordinary during this exchange. According to Smith, Jean simply got mad in "the regular way" and said, "something to the effect of, 'mind your own business ....' " Smith testified she "probably" called him names, but it was all her "usual" and "regular" behavior. Further, Smith testified they had not been drinking more alcohol than usual that day. This evidence does not suggest there was a provocation " 'so strong that [Smith's] reaction bypassed his thought process to such an extent that judgment could not and did not intervene.' " (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 650.) Rather, it demonstrates that Smith and Jean were simply in a routine (albeit hostile and profanity-laced) disagreement about an innocuous subject.

There was additional evidence from which a rational jury could find Smith was not acting in the heat of passion. Witness testimony and physical evidence showed Jean was seated in a chair and facing away from Smith when he shot her. Given that Jean was seated and turned away from Smith, she clearly did not provoke him by posing a risk of physical violence or intimidation.

Smith's 911 call immediately after the shooting also tended to show that his thought processes were not obscured by intense passion. During the call, Smith calmy explained he had just shot his wife and believed she was dead. He expressed fears he would be incarcerated for the shooting, bemoaning he would "spend the rest of [his] fricking life in jail." However, he did not express remorse for shooting her or concern for her well-being as she lay dying in the living room. Further, in the words of the trial court, Smith was "remarkably calm" during the call and his "speech and thought processing [were] lucid." According to the court, Smith did not show "any intense or extreme emotion" and, in fact, he "barely register[ed] any emotion"

12

at all. In light of Smith's calm demeanor, a rational jury could find Smith had not been overcome with intense emotion mere moments earlier.

Based largely on the same evidence just discussed, we conclude there was sufficient evidence from which a reasonable jury could find that, under the same facts and circumstances, a person of average disposition would not have acted without deliberation and reflection. " ' "A provocation of slight and trifling character, such as words of reproach, however grievous they may be, or gestures, or an assault, or even a blow, is not recognized as sufficient to arouse, in a reasonable man, such passion as reduces an unlawful killing with a deadly weapon to manslaughter." ' " (*People v. Wang* (2020) 46 Cal.App.5th 1055, 1073.) Although Smith testified that Jean cursed at him, and "probably" called him names (which he could not recall), a rational jury could conclude that mere cursing, belittling, or name-calling in the course of a mundane disagreement would not elicit such a strong emotional response in a reasonable person that his or her reason would be overcome.

In sum, there was substantial evidence to support the jury's finding of malice. Thus, we decline Smith's request to reduce the first degree murder conviction to a voluntary manslaughter conviction.

B

*Substantial Evidence Supported the Finding of*
*Premeditation and Deliberation*

Smith asks this court, in the alternative, to reduce his first degree murder conviction to a second degree murder conviction. He challenges his first degree murder conviction on grounds that the evidence was insufficient to establish premeditation and deliberation.

" 'Murder is the unlawful killing of a human being, or a fetus, with malice aforethought.' [Citation.] If the murder is 'willful, deliberate, and premeditated,' it is first degree murder. [Citation.] ' " 'In this context,

13

"premeditated" means "considered beforehand," and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." ' " [Citation.] " 'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' " [Citations.] "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly …." ' " (*People v. Morales* (2020) 10 Cal.5th 76, 88 (*Morales*).)

In *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), the Supreme Court identified three categories of evidence that are generally "sufficient to sustain a finding of premeditation and deliberation: (1) planning activity, or 'facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing'; (2) motive, or 'facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a "motive" to kill the victim'; and (3) manner of killing, or 'facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" to take his victim's life in a particular way for a "reason" ….' " (*Morales, supra,* 10 Cal.5th at pp. 88–89.) The Supreme Court has since emphasized that the *Anderson* " 'guidelines are descriptive and neither normative nor exhaustive, and that reviewing courts need not accord them any particular weight.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 324.)

14

With respect to the first *Anderson* factor, there was evidence to establish the existence of a plan to kill Jean. In particular, Smith took the witness stand and conceded he knowingly carried a loaded firearm on his person the day of the shooting. This gives rise to a reasonable inference that Smith foresaw the potential of a violent encounter with Jean. (See *People v. Salazar* (2016) 63 Cal.4th 214, 245 ["defendant brought a loaded gun with him to the [restaurant], demonstrating preparation"]; *People v. Lee* (2011) 51 Cal.4th 620, 636 ["defendant brought a loaded handgun with him on the night [the victim] was killed, indicating he had considered the possibility of a violent encounter"].) Another key piece of planning evidence was the video shown on rebuttal. In the video, Smith told Jean to shoot herself in the head. The fact he later killed her in a strikingly similar manner—by shooting her in the neck—suggests he harbored a premediated plan to kill her.[4]

Turning to the second *Anderson* factor, there was ample evidence of motive. By all accounts, the couple's marriage was an unhappy one characterized by alcoholism and bouts of verbal abuse. Multiple witnesses testified Jean routinely screamed at, berated, and emasculated Smith. Videos were also played for the jury showing the couple engaged in heated arguments. In one of the videos, Smith exhibited intense animosity towards Jean and called her epithets such as "asshole," "horrible bitch," "dumbass bitch," and "stupid idiot." The overwhelming evidence of a crumbling marriage and the extreme hostility between the killer and the victim was more than sufficient to establish motive. (See *People v. Williams* (2018) 23

---

4     At trial, Smith testified he carried the pistol for home protection. However, Smith's testimony did not preclude an inference of planning. "A rational trier of fact may disbelieve those portions of a defendant's statements that are obviously self-serving, reject implausible explanations, and draw inculpatory inferences from his testimony and the other evidence." (*People v. Winkler* (2020) 56 Cal.App.5th 1102, 1170.)

15

Cal.App.5th 396, 410 ["Here, there is evidence of motive: rage at the collapse of the marriage."]; *People v. Daniels* (1971) 16 Cal.App.3d 36, 46 ["Evidence showing jealousy, quarrels, antagonism or enmity between an accused and the victim of a violent offense is proof of motive to commit the offense."].)

The manner of the killing suggested premeditation and deliberation as well. Smith shot Jean in a vital region (the neck) with a loaded firearm from a distance of just a few feet away. She was seated in a chair, turned away from Smith, and defenseless as she sat watching a movie on her computer. The precise, execution-style of the killing evinces a deliberate and premediated plan to kill. (See *People v. Gomez* (2018) 6 Cal.5th 243, 283 [manner of killing tended to show premeditation and deliberation because victims "were shot from close range in the head or neck"]; *People v. Halvorsen* (2007) 42 Cal.4th 379, 422 [victims "were shot in the head or neck from within a few feet, a method of killing sufficiently ' "particular and exacting" ' to permit an inference that defendant was 'acting according to a preconceived design' "].)

Finally, in addition to the evidence relevant to the *Anderson* guidelines, Smith's 911 call tended to show premeditation and deliberation. As noted, Smith did not vocalize any fears concerning the health of his dying wife during the 911 call; rather, he only expressed concern that he would be incarcerated for his conduct. Further, as the court explained, Smith's demeanor on the 911 call was remarkably calm and emotionless. Smith's dispassionate behavior and his apparent lack of concern regarding his dying wife's well-being supported the jury's finding of premeditation and deliberation. (See *People v. Marks* (2003) 31 Cal.4th 197, 232 ["The 'calm,' 'cool,' and 'focused' manner of a shooting also supports the finding of premeditation and deliberation."]; *People v. Saterfield* (1967) 65 Cal.2d 752,

16

759 [evidence that killer "appeared calm when he arrived at a witness' house shortly" after killing was evidence of deliberation and premeditation].)

Collectively, this evidence supported the jury's finding of premeditation and deliberation. Because there was substantial evidence of premeditation and deliberation, we decline Smith's request to reduce the first degree murder conviction to a second degree murder conviction.

C

*The Matter Must Be Remanded for Resentencing*

The jury found true an allegation that Smith personally and intentionally discharged a firearm and proximately caused his wife's death. Based on this finding, the trial court imposed a firearm enhancement under section 12022.53, subdivision (d), which added 25-years-to-life to Smith's prison sentence. In doing so, the court denied a request from defense counsel to stay or strike the section 12022.53, subdivision (d) enhancement. On appeal, Smith contends he is entitled to a resentencing proceeding so the trial court may consider whether to strike the section 12022.53, subdivision (d) enhancement and, in its place, impose a lesser enhancement under section 12022.53, subdivisions (b) or (c).

"Section 12022.53 was first enacted in 1997 as part of the state's 'Use a Gun and You're Done' law. [Citation.] The statute sets out 'sentence enhancements for personal use or discharge of a firearm in the commission' of specified felonies. [Citation.] Section 12022.53, subdivision (a) lists the felonies to which the section applies. Section 12022.53(b) mandates the imposition of a 10-year enhancement for personal *use* of a firearm in the commission of one of those felonies; section 12022.53(c) mandates the imposition of a 20-year enhancement for personal and intentional *discharge* of a firearm; and section 12022.53(d) provides for a 25 year-to-life

17

enhancement for personal and intentional discharge of a firearm *causing great bodily injury or death* to a person other than an accomplice." (*People v. Tirado* (2022) 12 Cal.5th 688, 694–695, fns. omitted (*Tirado*).) Section 12022.53, subdivision (h) provides in part that a court "may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section."

At the time Smith was sentenced, case law made clear that section 12022.53, subdivision (h) authorizes a trial court to strike a section 12022.53, subdivision (d) enhancement entirely and impose no additional penalty. (See, e.g., *People v. Robbins* (2018) 19 Cal.App.5th 660, 677–679.) However, a split of authority existed among the Courts of Appeal as to whether a trial court could strike a section 12022.53, subdivision (d) enhancement and, in its place, impose a lesser enhancement under section 12022.53, subdivisions (b) or (c), where the lesser enhancement was not specifically charged in the information or found true by a jury. (Compare *People v. Morrison* (2019) 34 Cal.App.5th 217 [court has discretion to impose an uncharged lesser firearm enhancement after striking a section 12022.53, subdivision (d) enhancement], with *People v. Tirado* (2019) 38 Cal.App.5th 637 [court only has discretion to strike a section 12022.53, subdivision (d) enhancement entirely or take no action].)

After Smith was sentenced, and during the pendency of this appeal, the Supreme Court resolved the split of authority and concluded the statutory framework of section 12022.53 "permits a court to strike [a] section 12022.53(d) enhancement found true by the jury and to impose a lesser uncharged statutory enhancement instead." (*Tirado, supra*, 12 Cal.5th at p. 692; see *id.* at p. 700 ["When an accusatory pleading alleges and the jury finds true the facts supporting a section 12022.53(d) enhancement, and the

18

court determines that the section 12022.53(d) enhancement should be struck or dismissed under section 12022.53(h), the court may … impose an enhancement under section 12022.53(b) or (c)."].)

As noted, Smith asks us to remand the matter for resentencing so the trial court may consider whether to strike the subdivision (d) enhancement and, in its place, impose a lesser enhancement under subdivisions (b) or (c). He asserts the record does not show that the court understood the scope of its discretion when it sentenced him.

The People claim Smith forfeited his argument because, although his trial counsel asked the court to stay or strike the subdivision (d) enhancement, he did not ask the court to impose a lesser enhancement under subdivisions (b) or (c) in place of the subdivision (d) enhancement. However, the People agree that, to the extent Smith preserved his argument, he is entitled to a new resentencing proceeding.

The general rule is that judicial decisions are given retrospective effect to nonfinal judgments. The principle of retrospective application to nonfinal judgments "is well settled: 'As a matter of normal judicial operation, even a non-retroactive decision [i.e., one that cannot serve as a basis for collateral attack on a final judgment] ordinarily governs all cases still pending on direct review when the decision is rendered.' " (*People v. Guerra* (1984) 37 Cal.3d 385, 400.) That rule applies to Supreme Court decisions, like *Tirado*, that resolve conflicts between the Courts of Appeal or establish the meaning of a statute. (*Burris v. Superior Court* (2005) 34 Cal.4th 1012, 1023; *In re Borlik* (2011) 194 Cal.App.4th 30, 40; *People v. Walsh* (1996) 49 Cal.App.4th 1096, 1104 [because the Supreme Court "resolved a conflict between lower court decisions, the ordinary assumption of retroactive operation applies"].)

19

Applying these principles of retroactivity here, we conclude Smith is entitled to the retrospective application of the *Tirado* decision to his case.[5]

Further, like the parties, we believe the proper disposition is to remand the matter for resentencing. On the record before us, we have no confidence the trial court was aware of its authority to impose a lesser uncharged enhancement under section 12022.53, subdivisions (b) or (c) after striking a charged enhancement under subdivision (d). The record also gives us no clear indication the court would have declined to exercise its sentencing discretion if it was aware of its authority. On the contrary, the court made certain statements during sentencing indicating that there is a reasonable probability it might exercise its discretion, strike the enhancement under section 12022.53, subdivision (d), and impose a lesser uncharged enhancement under section 12022.53, subdivisions (b) or (c). In particular, the trial court opined that Jean was the "primary" perpetrator of verbal abuse in the marriage, Smith had no criminal history, and it appeared "he was a decent person" in other areas of his life.

To ensure *Tirado* receives its full retrospective effect, we remand the matter for resentencing proceedings during which the trial court shall exercise its sentencing discretion. We express no opinion regarding how the court should exercise that discretion on remand.

---

[5]    Because the *Tirado* decision must be given retroactive effect, we reject the People's assertion that Smith forfeited his claim of error by failing to request imposition of a firearm enhancement under section 12022.53, subdivisions (b) or (c), after the striking of the subdivision (d) enhancement.

IV

DISPOSITION

The judgment is reversed in part and the matter is remanded for resentencing purposes only.  In all other respects, the judgment is affirmed.


McCONNELL, P. J.

WE CONCUR:


HUFFMAN, J.


O'ROURKE, J.

21